Per Curiam:
The Ordnance Department of the Army on June SO, 19'50, awarded plaintiff company a contract for 130,000 shells to be produced for and delivered to the United States. With immaterial exceptions the company failed to produce and deliver the shells. Before the departmental agencies and thereafter in this court the company attributed the failure primarily to a national steel shortage, and to other secondary causes. However, after the end of the delay due to the steel shortage the company still failed to produce and deliver the shells within a time extended to make up for that delay. The Government terminated the contract for default, and claimed liquidated damages under its terms, plus a small amount, the claim for which was later withdrawn, as the excess cost due to the actual difference of price upon reprocurement.[1] The company denied default and *258 asserted that the United States owed it $47,874.29, as the amount it had expended and which was not repaid to it. In its present suit the plaintiff’s claim is stated to amount to $43,029.17. The United States denied any liability to plaintiff and has counterclaimed in the present suit for $29,264.98, the final amount which had been recomputed administratively as liquidated damages. The departmental administrative decisions had been adverse to the company as to all matters except with respect to the delay due to the steel shortage, for which due allowance was made.
We agree with the findings of the Commissioner that “the evidence does not establish and the plaintiff has not alleged that the administrative decisions in the'case on matters of fact were fraudulent, capricious, arbitrary, or so grossly erroneous as necessarily to imply bad faith; or that such decisions are not supported by substantial evidence.”
We find no merit in plaintiff’s challenge to the validity of the report of the Commissioner on the ground that the Commissioner did not conduct the hearing.
On the basis of the foregoing, plaintiff is not entitled to recover and its petition will be dismissed. The United States is entitled to judgment on its counterclaim in the sum of $29,264.98. Judgment will be entered accordingly.
It is so ordered.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Richard Arens, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff, Racine Screw Company, is a Wisconsin corporation with its principal place of business in Racine, Wisconsin.
2. Under date of May 25,1950, there was issued by Frank-ford Arsenal, Department of the Army, Ordnance Department, located in Philadelphia, an invitation for bids for furnishing 130,000 semi-finished 57 mm shell at a unit price of $.958, with a total price of $124,540. The invitation for bids provided that the bids would be received until June 14, 1950, at which time they would be publicly opened.
*259 3. The Continuation Schedule attached to the invitation to bids, and to which the bids were subject, provided in part as follows:
DELIVERY: F.O.B. Frankford Arsenal.
10,000 Shell on or before the first week of August 1950, a minimum of 12,000 Shell each week thereafter until completion.
Five (5) weeks after receipt of order 10,000 Shell and 12,000 per week thereafter until completion.
Time will be a material factor for the purpose of comparing bids. There will be added to each bid, other than the one offering to complete in the shortest time, provided the shortest time is m excess of the time set forth in the Invitation for delivery, an amount equal to the daily liquidated damages named in the Invitation for Bids multiplied by the number of calendar days that such bidders have named for performance of the work in excess of the days named by the bidder proposing to do the work in the shortest time.
Inspection and preliminary acceptance at Contractor’s Plant by the Ordnance District in which Contractor’s Plant is located. Title to vest in the Government upon delivery and final acceptance at destination.
All Bidders must supply Bid Bonds in the amount of 10%. Successful Contractor will be required to supply Performance Bond in the amount of 20%.
The successful Contractor will be required to deliver the minimum quantity of 130,000 each. The maximum quantity that will be accepted is 131,000 each, when caused by conditions of loading, shipping, packing, or allowances in manufacturing processes, and payments shall be adjusted accordingly.
Prior to the execution of this contract, the contractor will furnish a certified or photostatic copy of its Certificate of Registration with the Department of State, ■which copy shall be attached to the copy of this contract on file in the Office of the chief of the procuring service concerned.
The evidence does not reveal the date of the registration by the plaintiff with the Department of State (as a manu *260 facturer of arms) but the Certificate of Registration issued to the plaintiff provided that the Certificate “is valid for five years from August 22,1950.”
4. The Continuation Schedule also provided in part as follows:
The contractor shall be required to submit to F.A. prior to start of production, 100 Shell that are representative of the contractors production and have been inspected and accepted by the Area Ordnance District.
The Area Ordnance District in which the plaintiff was located was the Chicago Ordnance District, Department of the Army, with headquarters in Chicago.
5. Under date of June 12,1950, the plaintiff submitted its bid to Frankford Arsenal in accordance with the terms of the invitation for bids which it had received.
6. The body of a letter, dated June 30, 1950, addressed to the plaintiff from Frankford Arsenal reads as follows:
This is to inform you that Contract DA-36-231ORD-962 dated 30 June 1950 is being assigned to you in connection with your bid against F.A. Invitation 50-304 for 130,000 Shells, 57 M/M M307 at .958 each or a total of $124,540.00.
The definitive instrument is being withheld subject to the receipt of your Performance Bond in the sum of 20%.
Please expedite the bond so that the contract may be executed and mailed to you.
7. A letter, dated July 22, 1950, addressed to the plaintiff from Frankford Arsenal reads in part as follows:
There is inclosed herewith your executed triplicate copy of Invitation for Bid No. ORD-36-038-50-304.
Item No. One (1) has been awarded to you and Contract No. DA-36-038-ORD-962 assigned thereto.
The award as returned to the plaintiff from Frankford Arsenal was dated June 30,1950.
8. Except for the shell which the plaintiff submitted to Frankford Arsenal for inspection prior to authorization to proceed with production, the plaintiff failed to deliver any of the 130,000 shell which it was required by the contract to produce and deliver to Frankford Arsenal. The plaintiff contended before the Armed Services Board of Contract *261 Appeals and in tbis court that this failure arose out of causes beyond the control and without the fault or negligence of the plaintiff,[2] in that:
(a) a national steel shortage prevented the plaintiff from acquiring the required steel to perform the contract;
(b) the defendant delayed inspection of pilot lots and the inspection of shell in the plant of plaintiff;
(c) the defendant hampered the plaintiff in its inspection of gauges;
(d) the defendant changed the specifications; and
(e) the defendant solicited the plaintiff’s subcontractor to take over the prime-contract of the plaintiff during the term of the contract.
SHORTAGE OF STEEL
9. The specifications of the contract required the shell to be produced from a special grade of steel, FS 1117. Shortly before the plaintiff submitted its bid to Frankford Arsenal, it received general assurances from suppliers that the necessary steel would be available for the plaintiff to perform the contract. The plaintiff did not, however, solicit or receive any firm commitments for the delivery to it of the required steel, and this fact was known by the defendant at or prior to the award of the contract.
10. On July 24, 1950, the date on which the plaintiff received the letter of July 22, 1950, from Frankford Arsenal returning the award dated June 30, 1950, the plaintiff formally ordered the required steel from several suppliers, but the suppliers notified the plaintiff that they were unable to fill the plaintiff’s order. Thereafter, the plaintiff diligently sought to purchase the required steel, but due to a national steel shortage caused by the Korean conflict which began on June 25, 1950, the plaintiff was unsuccessful until after it had received a priority rating.
11. Prior to the enactment of the Defense Production Act of 1950 which went into effect on September 11, 1950, thei*e was, during the period of the Korean conflict, no provision of law authorizing priority of materials.
*262 12. By letter, dated October 13, 1950, the plaintiff was notified by the Chicago Ordnance District that it had been assigned a priority rating. Upon receipt of the priority rating the plaintiff diligently continued its efforts to purchase the required steel.
13. On November 8, 1950, the plaintiff received its first shipment of the required steel, grade FS 1117, in the amount of 53,460 pounds. By January 1, 1951, the plaintiff had received the necessary quantity of the required steel.
14. Under date of November 10, 1950, the plaintiff wrote to the Chicago Ordnance District as follows:
Due to the difficulty we have experienced in securing steel as evidenced by the enclosed correspondence we are herewith asking for an extension of time to protect us against liquidated damages.
We hope that your office can do something to correct conditions that have caused us delay in completing this contract.
This delay has been very costly to our company have sold the machine hours to the Frankford Arsenal we have had to pass up more profitable business.
The plaintiff did not receive a reply to the letter.
15. The weight of the evidence supports the plaintiff’s contention that the delay occasioned by the unavailability of the required steel was beyond the control and without the fault or negligence of the plaintiff.
INSPECTION OE SHELL
16. In view of the then unavailability of the special grade of steel, FS 1117, from which the specifications of the contract required the shell to be produced, the plaintiff made from C 1117 grade steel, which the plaintiff was able to procure, six shell bodies which were sent on October 12,1950, to Frankford Arsenal for checking. The six shell bodies were not a “pilot lot” which by the terms of the contract was to consist of “100 Shell that are representative of the contractors production * *
17. Under date of October 26,1950, the plaintiff wrote to Frankford Arsenal as follows:
*263 On October 12th we wrote you we were sending by Railway Express 6- 57 MM HEAT M 307 A-l Shell Bodies.
We asked that you have these pieces checked so that that we might proceed with production.
To date we have not heard and inasmuch as we are desierous [sic] of getting into. production we would appreciate hearing at your earliest convenience.
18. A letter, dated October 31,1950, from Frankford Arsenal to the plaintiff reads as follows:
Receipt is acknowledged of your letter of 26 October 1950. The six (6) 57 m/m HE AT M307A1 Shell Bodies were received and inspected, and report submitted to the Chicago Ordnance District.
19. A letter, dated November 9, 1950, from the Chicago Ordnance District to the plaintiff reads as follows:
With reference to six pieces which your company shipped to the Frankford Arsenal for inspection, this office is in receipt of a communication from Frankford Arsenal giving the results of that inspection which are as follows:
“Six pieces inspected on 28 Oct were rejected for reasons as follows Smcln lead of chasers distorted the 2.217-01 dimension cma .076 min wall thickness is from .0015 to .0025 less than .076 at the end of the 10 degree angle there is a 45 degree by .025 champher not permitted by dwg cma interior surface finish greater than 250 cma 2 shell are from .001 to .003 undersize of dimension .04 plus .01 cma 1 shell is .001 undersize on dimension 2.0555 minus .01 cma 1 shell rear edge of band is cut on an 11 degree angle cma 1 shell is .0002 oversize on dimension 2.280 minus .006 pd.”
The results of the above inspection is being forwarded to you for your information.
20. In December 1950 the plaintiff sent a pilot lot of shell to Frankford Arsenal. This pilot lot was rejected because of dimensional defects.
21. On March 7, 1951, an inspector employed by the defendant inspected a second pilot lot at plaintiff’s plant, and the pilot lot was on that date shipped to Frankford Arsenal. A letter, dated March 19, 1951, from the Chicago Ordance District to the plaintiff reads as follows:
*264 With reference to the pilot lot of 100 Shell submitted on subject contract to Frankford Arsenal for visual and dimensional inspection, you are advised that the pilot lot has been accepted and this letter will serve as your authority to proceed with production, providing the Shell are manufactured on similar equipment as the pilot lot.
22. After receipt of the letter of March 19,1961, from the Chicago Ordnance District authorizing the plaintiff to proceed with production, the plaintiff produced 8,230 shell which were never delivered. Although the plaintiff contended that the failure to deliver was caused by omission of the defendant’s inspectors to inspect the shell, the weight of the evidence is that the shell were inspected and rejected. The inspections were on a sampling basis in accordance with the prescribed inspection procedures. The Aveight of the evidence is that the defendant’s inspectors were always available on short notice whenever requested by the plaintiff and that the failure of the plaintiff to produce and deliver the shell was not attributable to delay by the defendant in its inspections of the shell.
INSPECTION OP GAUGES
23. An integral part of the process of producing shell is the checking of dimensions which is done with a variety of special gauges which the manufacturer must either make or buy from suppliers as part of his equipment. The plaintiff made some of the gauges which it used on the shell and bought other gauges. From the beginning of its work under the contract, the plaintiff was plagued with faulty gauges which resulted in dimensional defects in the shell. After the defendant had. in October 1950 rejected, because of dimensional defects, the six shell which the plaintiff had sent to Frankford Arsenal and after the defendant had in December 1950 rejected the plaintiff’s first pilot lot because of dimensional defects, the plaintiff, in January 1951 pursuant to a recommendation made by the defendant’s inspectors, sent its gauges to an institute in Chicago which had an arrangement with the defendant for testing and inspecting gauges. The plaintiff’s gauges were returned to *265 the plaintiff in February 1951. Thereafter, the next pilot lot sent by the plaintiff to Frankford Arsenal was accepted, and as noted in paragraph 21, supra, the plaintiff was authorized to proceed with production. The evidence does not support the plaintiff’s contention that it was “hampered” by the defendant in its inspection of gauges.
SPECIFICATION CHANGE
24. A letter, dated August 29,1950, from Frankford Arsenal to the plaintiff reads as follows:
Reference is made to contract DA-36-038-ORD-962, placed with you for 130,000 semi-finished shell, 57 MM M307A1.
Revision A, dated 6/21/50, has been made on drawing RP-1135, removing drill size 61/64" and replacing with dimension .92 plus .02, and adding tolerance symbol. Print of the revised drawing is inclosed and you are requested to follow it in the manufacture of the shell.
Please advise, as promptly as possible, what effect the revision in drawing will have upon the contract price and time of delivery.
25. Under date of September 12,1950, the plaintiff wrote to Frankford Arsenal as follows:
Replying to your letter of August 29th covering Revision A, dated 6/21/50 made on drawing RP-1135 removing drill size 61/64" and replacing with dimension .92 plus .02 and adding tolerance symbol on semi-finished 57MM M307A1 shells.
This change will not affect the contract price but we are enclosing our invoice covering shells made before the change and for 2 subland drills which we are having to reorder. We will be back in production by Friday September 15th.
26. The change in specifications occurred at least two months prior to the time that the plaintiff acquired its first shipment of the required steel, grade FS 1117. The specification change was minor. The shell made prior to the specification change consisted of approximately 900 shell which were made from C 1117 grade steel which the plaintiff had procured to make test shell for dimensional checks. *266 The specification change did not have any significant bearing on the failure of the plaintiff to fulfill its contractual obligations.
THE PLAINTIFF’S SUBCONTRACTOR
27. On January 24, 1951, the plaintiff sent to the Automatic Screw Products Company, located in Minneapolis, a purchase order for 75,000 57 mm shell at $802.50 per thousand, or a fraction over $0.80 each. The subcontractor was to perform only part of the work on the shell, with the remainder of the work to be done by the plaintiff.
28. The plaintiff, via its priority rating, diverted from its supplier to its subcontractor one-half million pounds of FS 1117 grade steel which was received and paid for by the subcontractor. There was no fixed date for the shell to be delivered to the plaintiff from the subcontractor, but the order was “Rush.” The plaintiff agreed to send the necessary gauges to the subcontractor until the subcontractor could make its own gauges.
29. The subcontractor did not deliver any shell to the plaintiff and the plaintiff did not pay any money to the subcontractor.
30. A letter, dated April 6,1951, addressed to the plaintiff from the Chicago Ordnance District reads as follows:[3]
Subject contract provides for delivery schedule which, if adhered to, would have resulted in the completion of deliveries prior to 1 September 1951. Notwithstanding that fact there has been an inexcusable delay in complying with your contractual obligations with the result that no deliveries of Shells called for by the contract have as yet been made.
There is abundant proof that the Government has been extremely patient in its efforts to secure compliance on your part but all such efforts have proven abortive.
Under the circumstances you are hereby advised that unless 24,000 Shells, in accordance with contract specifications, are delivered to the Government by 18 April 1951, and deliveries of the balance of the Shells, also in accordance with contract specifications, are com *267 pleted by 8 June 1951, subject contract shall be deemed automatically cancelled and terminated for your default.
31. A letter, dated April 24, 1951, addressed to the plaintiff from the acting Chief of the Legal Division of the Chicago Ordnance District, reads as follows:
The Government notified you by Registered Mail on 6 April, 1951, that unless you delivered 24,000 Shells, in accordance with subject contract’s specifications, by 18 April, 1951, and the balance as called for in said notice, that subject contract would be deemed automatically cancelled and terminated for your default.
Having failed to comply with said notice to deliver the quantity of 24,000 Shells by 18 April, 1951, you are hereby further notified that Contract No. DA-36-038ORD-962 is hereby terminated for your default.
Your attention is called to the provisions of subject contract rendering the Contractor liable in damages on inexcusable default, and you are hereby notified that the Government intends to hold your corporation liable for any and all damages which it may sustain as a result of your default.
32. A letter, dated May 2, 1951, addressed to the plaintiff from the Contracting Officer of the Chicago Ordnance District reads as follows:
Under date of 6 April 1951 you were informed that unless certain deliveries were made by 18 April 1951 your default in delivery could no longer be countenanced. Pursuant to the terms of the subject contract the Contracting Officer hereby makes the following findings:
1. The contract provides for delivery of Item No. 1 contained in Invitation for Bid No. ORD-36-038-50-304 dated 25 May 1950. The award of subject contract to you by the Government under date of 30 June 1950 provided for deliveries of Item No. 1 at the rate of 10,000 shell five weeks after receipt of order, and 12,000 per week thereafter until completion.
2. At this time the entire contract quantity of 130,000 remains undelivered with the exception of an acceptable pilot lot consisting of 100.
3. The delay in the deliveries of the quantities above mentioned cannot be deemed to be an “excusable delay”.
By virtue of the findings, the Contracting Officer hereby notifies you that your right to proceed with the delivery of the items specified above is terminated. *268 Pursuant to General Provision No. 11 of the said contract you may be held liable for any damages caused the Government by reason of such termination. In addition, pursuant to the provisions of the clause entitled “Liquidated Damages”, liquidated damages as set forth therein shall continue to be assessed until such time as the Government may reasonably procure similar material or supplies elsewhere.
In the event you disagree with the findings you are advised of your right to appeal in accordance with the provisions of General Provision No. 12 of the said contract.
33. General Provision No. 12 of the contract' entered into between the plaintiff and the defendant reads as follows:
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall be final and conclusive: Provided, That if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with theperfonnance of the contract and in accordance with the Contracting Officer’s decision.
34. The plaintiff did not appeal from the findings contained in the Contracting Officer’s letter quoted in paragraph 32, supra.
35. A letter, dated May 3, 1951, from the then president of the Automatic Screw Products Company to the Chicago Ordnance District reads as follows:
Confirming our telephone conversation of today, we herewith quote a price of $1.34 each for the fabrication of the 57 mm H.E. shell projectile. This price is based on our customary terms of 1% days net 30 and is fob *269 our plant, completely packaged, as required by Ordnance.
We are anxious to bear soon from you in this matter, inasmuch as we hays over $50,000.00 invested in raw materials for this part which we paid for when Bacine Screw Company was unable to finance. it. According to priorities, we could not dispose of this material legitimately, so our only out is to attempt to secure an order from you which requires 1117 shell quality steel, such as we have.
Should you decide to place this order with us, we will deliver one hundred (100) production samples within 10 days after notification, and 10 days thereafter, (assuming that our samples are satisfactory) we can start delivering at a minimum rate of 20,000 per month without pressing ourselves. Should you desire higher production than this, we could then tool the job on additional machines to meet your requirements. At present we have all of the necessary tooling, gages, and materials for this job and welcome an opportunity to serve you.
We thank you for this opportunity to quote and look forward towards receiving this contract.
36. On June 18, 1951, the defendant and the Automatic Screw Products Company, which had been the plaintiff’s subcontractor, entered into a negotiated contract in which the Automatic Screw Products Company agreed to produce and deliver to the defendant the 130,000 semi-finished 57 mm shell at a unit price of $1.27595, with a total price of $165,874. The delivery schedules called for 20,000 shell to be delivered in July 1951 and 20,000 a month to be delivered each month thereafter through December 1951, with the final 10,000 to be delivered in January 1952.
37. In July 1951 the Automatic Screw Products Company delivered a pilot lot of shell to Frankford Arsenal which was approved; but thereafter, by letter dated November 20, 1951, the defendant terminated the contract with the Automatic Screw Products Company.[4]
38. The weight of the evidence does not support the plaintiff’s contention that the defendant interfered in the performance by the plaintiff of the contract by soliciting the plaintiff’s subcontractor to take over the prime contract of *270 the plaintiff during the term of the contract. The evidence tending to sustain this contention is nebulous, fragmentary and unconvincing.
39. Subsequent to the termination of the contract with the Automatic Screw Products Company, the defendant obtained the shell from another contractor under a contract which called for finished rather than semi-finished shell.
ASSESSMENT OP DAMAGES
40. A letter, dated September 25,1953, from the contracting Officer of the Chicago Ordnance District addressed to the plaintiff reads as follows:
Re: Contract No. DA-36-038-ORD-962
Tour attention is directed to the letter from this office dated 2 May 1951 under which you were informed that the subject contract was terminated for your default. That letter read in part:
“Pursuant to General Provision No. 11 of the said contract you may be held liable for any damages caused the Government by reason of such termination. In addition, pursuant to the provisions of the clause entitled ‘Liquidated Damages’, liquidated damages as set forth therein shall continue to be assessed until such time as the Government may reasonably procure similar material or supplies elsewhere.”
The material which you failed to deliver under the subject contract was reprocured as rapidly as possible under existing circumstances. The total amount of excess costs due to the actual difference of price upon reprocurement are $31.80. In addition to this amount, pursuant to the provisions of the clause of the subject contract entitled “Liquidated Damages”, the amount of liquidated damages has been determined to be $95,991.60. The total amount due and owing to the Government, therefore, is $96,023.40.
Demand is hereby made upon you for payment of the sum of $96,023.40 which sum has been determined to be owing by you to the United States of America as a result of the termination for default of the subject contract.
41. The contract entered into between the plaintiff and the defendant contained standard provisions for termination of the contract for the convenience of the Government.
*271 42. General Provision No. 11 of the contract entered into between the plaintiff and the defendant reads in pertinent part as follows:
(a) The Government may, subject to the provisions of paragraph (b) below, by written Notice of Default to the Contractor terminate the whole or any part of this Contract in any one of the following circumstances:
(i) if the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof; or
(ii) if the Contractor fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, and in either of these two circumstances does not cure such failure within a period of 10 days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such failure.
(b) The Contractor shall not be liable for any excess costs if any failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the Contractor. Such causes include, but are not restricted to, acts of God or of the public enemy, acts of the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, unusually severe weather, and defaults of subcontractors due to any of such causes unless the Contracting Officer shall determine that the supplies or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit the Contractor to meet the required delivery schedule.
(c) In the event the Government terminates this contract in whole or in part as provided in paragraph (a) of this clause, the Government may procure, upon such terms and in such manner as the Contracting Officer may deem appropriate, supplies or services similar to those so terminated, and the Contractor shall be liable to the Government for any excess costs for such similar supplies or services, Provided, That the Contractor shall continue the performance of this contract to the extent not terminated under the provisions of this clause.
:f: s|* ifc :Je
(e) If, after notice of termination of this contract under the provisions of paragraph (a) of this clause, it is determined that the failure to perform this contract is due to causes beyond the control and without the *272 fault or negligence of the Contractor pursuant to the provisions of paragraph (b) of this clause, such Notice of Default shall be deemed to have been issued pursuant to the clause of this contract entitled “Termination for Convenience of the Government,” and the rights and obligations of the parties hereto shall in such event be governed by such clause. {Except as otherwise provided in this contract, this paragraph (e) applies only if this contract is with a military department.)
_ (f) The rights and remedies of the Government provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this contract.
43. The contract entered into between the plaintiff and the defendant contained the following provisions for liquidated damages:[5]
If the contractor fails or refuses to make delivery of the materials or supplies within the time specified in Article I, or any extension thereof, the actual damage to the Government for the delay will be impossible to determine, and in lieu thereof the contractor shall pay to the Government, as fixed, agreed, and liquidated damages for each calendar day of delay in making delivery, the amount as set forth in specifications or accompanying papers, and the contractor and his sureties shall be liable for the amount thereof; Provided, however, That the Government reserves the right to terminate the right of the contractor to proceed with deliveries of such part or parts thereof as to which there has been delay, and to purchase similar material or supplies in the open market or secure the manufacture and delivery thereof by contract or otherwise, charging against the contractor and his sureties any excess cost occasioned the Government thereby, together with liquidated damages accruing until such time as the Government may reasonably procure similar material or supplies elsewhere; Provided further, That the contractor shall not be charged with liquidated damages or any excess cost when the delay in delivery is due to unforeseeable causes beyond the control and without the fault or negligence of the contractor, including, but not restricted to, acts of God or the public enemy, acts of the Govern *273 ment, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, unusually severe weather, and delays of a subcontractor due to such causes unless the contracting officer shall determine that the materials or supplies to be furnished under the subcontract are procurable in the open market, if the contractor shall notify the contracting officer in writing of the cause of any such delay, within 10 days from the beginning thereof, or within such further period as the contracting officer shall, with the approval of the agency head or his duly authorized representative, prior to the date of final settlement of the contract, grant, for the giving of such notice. The contracting officer shall then ascertain the facts and extent of the delay and extend the time for m airing delivery when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal, within 30 days, by the contractor to the Department head or his duly authorized representative, whose decision on such appeal as to the facts of delay and the extension of time for making delivery shall be final and conclusive on the parties hereto.
In the event that the contractor refuses or fails to make delivery by the date specified, the actual damages being impossible of determination, there will be deducted as liquidated damages under the conditions set forth hi detail above Vs of 1% per day of the contract price for each day of delay in making delivery beyond the date set forth in the contract for such delivery.
44. A letter, dated October 16,1953, from the attorney for the plaintiff, addressed to the attention of the Contracting Officer of the Chicago Ordnance District, reads in part as follows:
It is the position of the Racine Screw Company that they do not owe any monies on this contract. It is their position that they are entitled to $47,874.29 from the United States Government under the terms of that contract. The $47,874.29 represents money expended by them under this contract that the United States Government did not repay to the Racine Screw Company. This letter will constitute a demand by the Racine Screw Company that the United States Government through the Chicago Ordnance District pay to the Racine Screw Company under the terms of Contract No. DA-36-038ORD-962 the sum of $47,874.29 This letter will also demand of you by return mail a Bill of Particulars as to *274 how you arrived at the liquidated damages in the amount of $96,023.40.
It is also the position of the Eacine Screw Company that the Eacine Screw Company was never in default of Contract No. DA-36-038-OED-962, and that any default under the terms of the above contract was due to the United States Government.
This letter will also serve as a notice of appeal from your decision of September 25, 1953, and the Eacine Screw Company hereby appeals the decision of September 25, 1953, under the Disputes Clause in the contract, and requests an oral hearing thereon before the appropriate Appeal Board.
45. A letter, dated October 22,1953, and an enclosure from the Contracting Officer of the Chicago Ordnance District addressed to the attorney for the plaintiff reads in part as follows:
The Government denies that the sum of $47,874.29 or any other sum is owing to the Eacine Screw Company. The Government also denies that the Eacine Screw Company is entitled to any sum of money from the U.S. Government under the terms of the subject contract or by reason of any statutes, regulation or legal obligation.
Inclosed you will find a copy of “Computation of Liquidated Damages” which will serve to explain the computation of the amount of $95, 991.60.
Attention is also called to General Provision 12 of the subject contract with reference to the right of the contractor to appeal from a decision of the Contracting Officer within thirty days from the date of receipt of such decision.
This letter confirms previous letters to Eacine Screw Company dated 2 May 1951 and 25 September 1951. Demand is again made upon Eacine Screw Company for payment of the sum of $96,023.40 which sum has been determined to be owing by that company to the United States of America as a result of a termination for default of the subject contract and liquidated damages as specified by that contract.
$ $ ‡
COMPUTATION OP LIQUIDATED DAMAGES RACINE SCREW COMPANY
Contract DA-36-038-OED-962
The items not delivered under the subject contract were reprocured on contract DA-11-022-OED-305 *275 with Automatic Screw Products Company. The damages under the liquidated damages clause of said contract are computed from the delivery schedule of Racine Screw Company to the delivery schedule on Automatic Screw Products Company. The article calls for calendar day computation, but is impossible inasmuch as the delivery schedule on Automatic Screw Products Company was not met and the schedule as listed in the contract is a monthly schedule. The delivery schedule on Racine called for 10,000 shell on or before the first week of August 1950 and a minimum of 12,000 shell each week thereafter until completion. The delivery schedule on Automatic Screw Products Company is 20,000 a month from July 1951 through December 1951 and 10,000 for January 1952.

PROCEEDINGS BEFORE THE ARMED SERVICES BOARD OF CONTRACT APPEALS
46. On September 15,1954, the plaintiff’s appeal was heard before an Army Contract Appeals Panel of the Armed Services Board of Contract Appeals.
47. Under date of May 17,1955, the Armed Services Board of Contract Appeals issued its written opinion and decision, the pertinent parts of which are as follows:
*276 This is an appeal from a decision of the contracting officer terminating the above contract for default and assessing excess costs of $31.80 and liquidated damages of $95,991.60. The appellant has demanded $47,874.29 for money spent under the contract.
*****
DECISION
The following issues are presented:
1. The propriety of the assessment of liquidated damages.
2. The excusability of the failure to perform because of:
a. The failure to secure steel.
b. Delays by the Government in inspection of shell and gauges.
c. Changes in specifications.
d. The solicitation by Chicago Ordnance District of appellant’s subcontractor, Automatic Screw Company, as repurchase contractor.
3. The computation of liquidated damages.
4. The propriety of the assessment of excess costs.
5. The Government contends that the failure to appeal within 30 days from the termination for default forecloses a determination that the termination was for the convenience of the Government. In view of the decision reached by us it is unnecessary for us to determine this issue.
1. The frofriety of the assessment of liquidated damages.
A true liquidated damages provision is not a penalty clause when it is included in a contract to protect the Government against foreseeable risks. (U.S. v. Bethlehem Steel Co., 205 U.S. 105.) The type of provision used in this case is appropriate tor that purpose.
Appellant points out that the provision was not authorized by paragraph 7-105.5 of the Armed Services Procurement Regulation.
The authorized article should have become paragraph (f) of General Provision No. 11, “Default”. The termination and assessment of excess costs and liquidated damages purported to be made under that article. It is contended that the article used was inapplicable for both reasons. The facts are that it was included in the contract and that the appellant agreed to it; and the Government was entitled to assert whatever rights it may have had thereunder, however it described them.
The appellant was not, and does not claim to have *277 been, prejudiced by the use of this article, instead of the one set forth in the regulation.
2. Excusability of failure to perform.
a. Failure to secure steel. * * * From the foregoing we find that, before being awarded the contract, appellant had received appropriate assurances from its suppliers as to the availability of necessary materials in time for substantial compliance with the delivery schedule ; that its subsequent delay in securing such materials was due primarily, not to its inability to make payment therefor, but to the steel shortages resulting from the outbreak of Korean hostilities; and that the latter was an unforeseeable cause beyond the contractor’s control and not due to its fault or negligence. We therefore find that such delay — until actual delivery of the steel and for a reasonable time thereafter for performance— was excusable. * * *
b. Ueld/ys of the Government in inspection of shell and gauges. The lot of 6 shell submitted for inspection in October 1950 was not made of specification steel, and was not properly a pilot lot of 100. Inspection was not required by the contract, but was merely a courtesy extended by the Government. Any delay involved therein was not excusable. However, this episode is of no significance, since the delay during this period already has been found excusable on account of the steel shortage.
Pilot Lot “A” was promptly submitted for inspection on 19 December 1950. The date of the inspection report does not appear in the record, but the fact that appellant’s gauges were sent for inspection to the Chicago Gauge Laboratory in January would have prevented further manufacture during that month in any event. The time thus consumed was apparently regarded by both parties as in furtherance of the performance of the contract, and will be so treated. Upon return of the gauges a new Pilot Lot “B” was submitted and found acceptable. Appellant was authorized on 19 March 1951 to proceed with performance and the excusable delay expired on that date. The contract was properly terminated for failure to meet the delivery schedule thereafter established.
c. Changes in specifications. These changes were made in August and September 1950, a period of delay already found to be excusable because of the steel shortage. There is no evidence that they had any effect on the delay in delivery, and it is accordingly found that they did not.
*278 d. The alleged solicitation by Chicago Ordinance District of Appellant's subcontractor, Automatic Screw Co., as repurchase contractor. It appears that the first approach of Automatic Screw Co. to this procurement was through the Chicago Ordnance District, and that it became replacement contractor by negotiation with that office. There is, however, no evidence that the activities of the Automatic Co. interfered with appellant’s performance. It is true that it failed to produce upon its subcontract, but the subcontract was made long after the prime contract. Appellant already had assumed the responsibility of performance. The failure of this subcontractor is no excuse for its failure to do so. It does not appear that the shell could not have been otherwise produced. * * *
3. The computation of liquidated damages.
Liquidated damages were assessed for the delay from the delivery dates of appellant’s contract until the delivery dates of the replacement contract with Automatic Screw Company. We have found that the delay was excusable to the extent of the periods covered by the steel shortage of 1950 and the time for inspection of gauges. In the absence of agreement upon a new delivery schedule the appellant was entitled to. a reasonable time for performance. This was determined by the letter of 6 April 1951, to be 24,000 by 18 April 1951 and the balance by June 1951. The period so set allows approximately 12 weeks from 19 March 1951, when Pilot Lot “B” was accepted. That is substantially the same length of time as was allowed by the original delivery schedule. We accordingly find that the delay in delivery was excusable until the period so set, and that the computation of liquidated damages should commence with respect to 24,000 shell on 18 April 1951, and with respect to the balance on 8 June 1951. The contracting officer properly computed the period as running until the delivery dates provided in the replacement contract.
The appellant is entitled to no credit for the 8230 shell made after acceptance of Pilot Lot “B”. Notwithstanding the claim that inspection was not available, it is not controverted that 953 were in fact inspected and rejected on 16 April 1951. No details are furnished, but it is a fair inference that these were part of the shell referred to. On that assumption the percentage of rejections was sufficiently high to justify rejection of the whole lot. In the absence of evidence furnishing any other explanation of the situation, we must find that that is what happened.
*279 4. The propriety of the assessment of excess costs.
Appellant alleges that because of differences between its contract and the repurchase contract with the Automatic Screw Company, the unit price recited in the latter is an improper measure of the excess costs incurred by the Government in the reprocurement of the 100 shell. We find it unecessary to rule on this issue, in view of our subsequent finding as to the assessment of excess costs generally.
To recapitulate, appellant contracted to furnish 130,000 shell at a unit price of $.958. After termination of its contract, 100 shell were procured from the Automatic Screw Company under a repurchase contract, at a unit price of $1.27595. After termination of the contract of the Automatic Screw Company, the remaining 129,900 shell were procured from the Monroe Auto Equipment Company under a second repurchase contract, at a unit price of $.939. The contracting officer has assessed against appellant the $31.80 loss incurred in the repurchase of the first 100 shell ((100X $1.27595) — (100X$.958) =$31.80); disregarding the $2,468.10 saving realized on the repurchase of the remaining quantity ((129,900 X $.958) — (129,900 X $.939) =$2,468.10).
With respect to the repurchase of contract supplies, all that the Government reasonably may demand is that it shall be held harmless from any loss on the entire transaction. If some of the supplies are repurchased at a saving, and others at a loss, the savings and the losses should be balanced against each other to determine whether excess costs may be assessed at all and, if so, in what amount. * * * In the present case, since the saving realized on the second repurchase was substantially greater than the loss incurred in the first, we find improper the assessment of any excess costs whatsoever.
The appeal is sustained in the respects hereinbefore mentioned; otherwise it is denied. The file will be returned to the contracting, officer for further action in accordance with this opinion. The contractor may appeal anew, under the ‘^Disputes” clause of the contract, from any unfavorable decision made by the contracting officer in connection with the action directed herein.
48. A letter, dated July 12,1955, from the Contracting Officer of the Chicago Ordnance District addressed to the plaintiff reads in part as follows:
In accordance with the decision of the Armed Services Board of Contract Appeals the undersigned Con *280 tracting Officer hereby makes the following findings:
1. The assessment made by the letter from the Chicago Ordnance District dated 25 September 1953 of excess costs in the amount of $31.80 due to the actual difference of price upon reprocurement of items not delivered as a result of your default on the subject contract is hereby withdrawn. Reference is made to the decision of the Armed Services Board of Contract Appeals cited above wherein it was stated:
“With respect to the repurchase of contract supplies, all that the Government reasonably may demand is that it shall be held harmless from any loss on the entire transaction. If some of the supplies are repurchased at a saving, and others at a loss, the savings and the losses should be balanced against each other to determine whether excess costs may be assessed at all and, if so, in what amount.”
In accordance with the decision, part of which is quoted above, it is the determination of the Contracting Officer that there have been no excess costs of repro-curement that may be assessed against the account of your company.
* ^ H* # *
In view of the quoted decision the amount of liquidated damages under the clause of the subject contract entitled “Liquidated Damages” has been recomputed and determined to be $29,264.98.
49. The Contracting Officer’s calculation pursuant to the decision of the Armed Services Board of Contract Appeals was as follows:

*281 50. A letter, dated July 20,1955, from the attorney for the plaintiff, addressed to the attention of the Contracting Officer of the Chicago Ordnance District reads in part as follows:
This letter will serve and constitute a notice of appeal from your decision of July 12th, 1955 under the disputes clause of the above described contract and under authorization of the Armed Services Board of Appeals under and by the decision by the Armed Services Board of Appeals under date of May 17 th, 1955.
It is in the position of the Racine Screw Co. that your decision of July 12th, 1955 is incorrect and does not comply with the decision of the Armed Services Board of Appeals dated May 17th, 1955 and as filed as of June 2nd, 1955.
It is the position of the Racine Screw Co. that your decision of July 12th, 1955, is contrary to the terms of contract rjíjtDA 36-088-ORD-962.
51. A letter, dated December 9,1955, and an enclosure addressed to the Armed Services Board of Appeals from the attorney for the plaintiff reads as follows:
Racine Screw Company submits the following as a computation of liquidated damages under the decision of the Armed Services Board of Appeals dated May 17, 1955, paragraph three, page nine, assuming that the Board is correct in its decision which we do not concede. It is the contention of the Racine Screw Company that if the letter of April 6, 1951 is a letter determining what is a reasonable time for performance because of excusable delay, then the date set forth and the production required in that letter must be adhered to and liquidated damages should be computed on the same basis according to the same elapsed time as set forth in the letter of AprS 6, 1951. We, therefore, have computed the total liquidated damages based upon the elapsed time of seventy four (74) days from the due dates set forth in the decision of the Board of Contract Appeals being 24,000 as of April 18, 1951 and 106,000 as of June 8, 1951 in accordance with the attached schedule as follows:
24,000 _$ 3,402.82
106, 000 _$15,029.10
TOTAL _$18,431.92
* $ * % *

*282

52. On December 15, 1955, there was a hearing before the Army Contract Appeals Panel of the Armed Services Board of Contract Appeals on the appeal of the plaintiff from the ruling of the Contracting Officer made under the order of the Armed Services Board of Contract Appeals, dated May 17, 1955.
53. Under date of March 5, 1956, the Armed Services Board of Contract Appeals issued an opinion and decision affirming the ruling of the Contracting Officer made under the order of the Board, dated May 17,1955.
SUMMARY AND ULTIMATE FINDINGS
54. Under the contract which was awarded to the plaintiff under date of June 30,1950, and which was sent to the plaintiff under date of July 22,1950, the plaintiff was required to produce in accordance with the specifications and deliver to Frankford Arsenal within five weeks after receipt of the order 10,000 shell and 12,000 per week thereafter until completion of the contract.
Prior to its start of production the plaintiff was also required to submit to Frankford Arsenal 100 shell that were representative of the plaintiff’s production and that had been inspected and accepted by the Area Ordnance District.
55. Except for a pilot lot of 100 shell, the plaintiff did not produce and deliver to the defendant any shell which the plaintiff was required to produce and deliver.
56. The delay occasioned by the unavailability of the steel required to complete the contract was the only delay which was beyond the control and without the fault or negligence of the plaintiff. On November 8,1950, the plaintiff received *283 its first shipment of the required steel in the amount of 53,460 pounds. By January 1, 1951, the plaintiff had received the necessary quantity of the required steel.
57. The plaintiff did not produce an acceptable pilot lot until March 7, 1951, which was approximately four months after it had received its first shipment of the required steel.
58. The defendant extended the time for delivery until a period beginning on April 18,1951. This was three and one-half months after the plaintiff had received the necessary quantity of the required steel and one month after the defendant notified the plaintiff that the plaintiff’s successful pilot lot had been approved.
59. The evidence does not establish and the plaintiff has not alleged that the administrative decisions in the case on matters of fact were fraudulent, capricious, arbitrary, or so grossly erroneous as necessarily to imply bad faith; or that such decisions are not supported by substantial evidence.
CONCLUSION S OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is therefore dismissed.
It is further concluded, that the United States is entitled to recover on its counterclaim against plaintiff and it is therefore ordered and adjudged that the United States recover of and from the plaintiff the sum of twenty-nine thousand, two hundred sixty-four dollars and ninety-eight cents ($29,264.98).

 Tie total amount claimed was $96,023.40.

 The applicable provisions of the contract relating to excusable failure to perform are set forth hereinafter in connection with Assessment of Damages.

 In the proceedings before the Board of Contract Appeals and in this court the defendant conceded that the letter herein quoted constituted an extension by the defendant of the plaintiff’s time for completion of the contract.

 See Automotive Screw Products Co. v. United States, 145 Ct. Cl. 94.

 The plaintiff contended before the Armed Services Board of Contract Appeals and in this court that the Liquidated Damages provisions are not part of the contract, because they are not in accord with the form prescribed by paragraph 7-105.5 of the Armed Services Procurement Regulations.