**SUNDSTRAND TURBO, a Division of Sundstrand Corporation**

v.

**The UNITED STATES.**

**No. 300–65.**

United States Court of Claims.

Jan. 19, 1968.

Gilbert A. Cuneo, Washington, D. C., attorney of record, for plaintiff. David V. Anthony, Herbert L. Fenster, and Sellers, Conner & Cuneo, Washington, D. C., of counsel.

David Orlikoff, Washington, D. C., with whom was Asst. Atty. Gen., Edwin L. Weisl, Jr., for defendant. Robert J. Wieferich, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

SKELTON, Judge.

This is a suit to recover claims based on the termination for convenience by the government of two cost-plus-fixed fee (CPFF) contracts. The defendant awarded contract number AF 04(645)–27 (hereinafter referred to as contract 27) to American Machine and Foundry Company (hereinafter called AMF) for research, development, and design of an accessory power system (APS) for the Atlas Missile for an estimated $5,930,539.25, on July 19, 1956. A second contract was awarded to this company on February 14, 1957, being number AF 04(647)–73 (hereinafter called contract 73), which called for the manufacture of 112 APS at the company's "Turbo Division" plant at Pacoima, California, and funded in the amount of $6,206,466. The power system was to be of the gas-generated type. These contracts were amended from time to time so that by the date they were terminated their estimated costs and fixed fees had been increased to $27,112,668.23. The 112 APS units were required to be delivered by December 31, 1959.

AMF began work on the two contracts in a building known as No. 10, which it had constructed in 1956. This building was sold by AMF to the Aetna Life Insurance Company and leased back from this company for a period of ten years at an annual rental of $62,183.

On January 31, 1958, the plaintiff, Sundstrand Turbo, a division of Sundstrand Corporation, an Illinois Corporation (hereinafter called plaintiff or Sundstrand) purchased the properties and fixed assets, including the two contracts involved here, of AMF's Turbo Division for the sum of one million dollars, based on the appraisal of private appraisers employed by plaintiff to value the property. These fixed assets had previously been carried on the books of AMF in the approximate amount of

$500,000. The defendant accepted plaintiff as the successor of AMF on the two contracts in accordance with the provisions of a novation agreement signed February 1, 1958, by defendant, plaintiff, and AMF, the pertinent portions of which will be described in the ensuing paragraphs. The plaintiff immediately entered upon the performance of the two contracts.

During the performance of the contracts, the defendant decided to use a different propellant system for the Atlas missiles than that called for in the instant contracts, and, accordingly, terminated both contracts on February 10, 1959, for the convenience of the government under the "Termination for Convenience" clause of the contract.[1] There was no dissatisfaction with plaintiff's performance of the contracts, and the termination was caused solely by the decision of the government to use a different propellant system for the missiles.

Upon the termination of the contracts, problems immediately arose as to the types, kinds, and extent of termination costs, fees, and expenses that should be paid to plaintiff by defendant. Situations of this kind always pose problems for all concerned, and this case is no exception. The plaintiff presented bills and vouchers for its fees and costs to defendant for payment. The fees were negotiated and agreed upon and defendant paid plaintiff as fees the sum of $786,000 on contract 27 and $650,000 on contract 73. Plaintiff was paid $14,792,029.10 as costs on contract 27 and $10,884,639.13 on contract 73. However, plaintiff claimed that it was entitled to an additional $552,983.51 as reimbursement for its actual rental, occupancy, depreciation and general and administrative (G&A) costs, and an additional sum of $310,266.38 for breach of an implied

contract by defendant. These items, except the breach of contract claim, which is now Count II, were presented by plaintiff to defendant in the form of five separate claims,[2] which comprise Count I before this court. They may be briefly described as follows:

*Claim 1*—for depreciation costs on the purchase price valuation of approximately one million dollars plaintiff paid AMF for its fixed assets from the date of purchase. Defendant's contracting officer disallowed this valuation except as to the value of $500,000 carried on the books of AMF for such fixed assets. Plaintiff claims the difference in its depreciation costs in the sum of $141,876.13.

*Claim 2*—for rental costs incurred for building No. 10 from August 1, 1960, to June 1, 1962, in the amount of $151,725.

*Claim 3*—for true depreciation costs for building No. 20 under a certificate of necessity for the remainder of the five-year depreciation period continuing after December 31, 1959, in the sum of $50,439.94.

*Claim 4* [3]—for costs of occupancy of building No. 10, representing idle space costs, from January 1, 1960, to August 1, 1960, in the sum of $100,841.

*Claim 5* [4]—for general and administrative costs relating to subcontract administration and termination, in the sum of $108,101.44.

All of these claims were submitted to the contracting officer and they were denied by him. The plaintiff duly appealed to the Armed Services Board of Contract Appeals (ASBCA), which consolidated the claims into one case, conducted a trial and heard evidence, and handed down an opinion sustaining the decision of the

---

1. The contract contained the standard "termination for convenience" and "disputes" clauses usually found in government contracts.

2. Plaintiff also presented two other claims which were later approved and paid and are not involved in this lawsuit.

3. This claim was known and identified before the Armed Services Board of Contract Appeals as Claim 5.

4. This claim was known and identified before the Armed Services Board of Contract Appeals as Claim 6.

contracting officer and denying all of plaintiff's claims.[5]

Thereafter, plaintiff filed this suit in which it seeks recovery on the same claims which were denied by the ASBCA, together with its claim for breach of contract. It contends that the decision of the ASBCA (sometimes called the Board) on factual matters is not binding on this court because it is capricious, or arbitrary, or so grossly erroneous as to imply bad faith, or is not supported by substantial evidence. It also alleges that the decision of the Board on questions of law is erroneous and has no finality. The case is now before us for judicial review.

■ The defendant urges that the Board's decision should be accorded finality in view of the Wunderlich Act, 68 Stat. 81, 41 U.S.C. §§ 321–322 (1964); Morrison-Knudsen v. United States, 345 F.2d 833, 170 Ct.Cl. 757 (1965); United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963) and similar cases. Without doubt, the Board had jurisdiction of these claims and could have granted complete relief under the provisions of the two contracts. It conducted a full trial, received evidence and briefs of the parties, made findings and conclusions and disposed of all the claims involved. Under these circumstances, the scope of our review is narrow and limited. However, in view of the allegations of the plaintiff, we will proceed to consider plaintiff's claims and determine what finality, if any, should be given to the findings, conclusions, and decision of the Board with reference to such claims. For the sake of continuity, we will treat the claims in their numerical order, except for Claims 2 and 4 which will be considered together, and will set forth such facts and circumstances (which may or may not have been described in the preceding paragraphs) as may be necessary to explain each of such claims.

■ As a preliminary matter, we will briefly discuss the propriety of the administrative proceeding. It is the plaintiff's position that the findings of fact made by the ASBCA are a nullity and without binding effect on this court since the presiding member of the Board neither wrote the Board's decision, nor was he a party to it. This contention must be rejected for we recently stated that in the absence of a rule compelling the Board's decision to be rendered by the presiding member there is no such requirement. Anthony P. Miller, Inc. v. United States, 161 Ct.Cl. 455, 474, n. 11, cert. denied, 375 U.S. 879, 84 S.Ct. 149, 11 L.Ed.2d 111 (1963). Similarly, we have rejected contentions challenging the validity of the reports of our trial commissioners on the ground that they did not conduct the hearing. See Racine Screw Co. v. United States, 156 Ct.Cl. 256, 258 (1962).

## COUNT I

### Claim 1

Prior to purchasing the fixed assets of the Turbo Division of AMF, plaintiff hired appraisers to make an appraisal of these assets. The report of the appraisers showed that the property had a value of $988,946.79. The plaintiff added to this amount the appraised value of other assets which had been acquired for performance of the contracts subsequent to the purchase of the Turbo Division, which made the total value of the property approximately one million dollars. Actually, plaintiff paid AMF one million dollars for the fixed assets of its Turbo Division. The sale was completed January 31, 1958. The plaintiff submitted the appraised value of all of these assets to the Internal Revenue Service for tax depreciation purposes, and the IRS approved it as submitted.

At the time plaintiff acquired the Turbo Division, a novation agreement was signed by plaintiff, AMF, and de-

5. See opinion in Sundstrand Turbo, A Division of Sundstrand Corporation, ASBCA No. 9112, rendered January 29, 1965.

fendant, whereby the plaintiff was accepted by the defendant as the contractor in both of the contracts in place of AMF. Paragraph 7 of the novation agreement provided as follows:

> 7. The Transferor and the Transferee hereby agree that no claim for payment by or reimbursement from the Government shall be made by either of them with respect to any costs, increased taxes or other expenses arising out of or attributable to (i) said assignment, conveyance and transfer, or (ii) this Agreement, other than those which the Government would have been obligated to pay or reimburse under the terms of the Contracts in effect prior to the execution of this Agreement.

After the purchase of the Turbo Division was completed, plaintiff charged as a part of the costs in performing the two contracts depreciation based on the valuation of the Turbo Division assets which had been approved by the IRS for tax purposes. Defendant's contracting officer disapproved such depreciation and allowed plaintiff to charge as costs in performing the contracts depreciation based only on the value of the assets carried on the books of AMF prior to the sale, which was approximately $500,-000. This was approximately one-half of the new value plaintiff placed on the property for depreciation purposes. Plaintiff says that it is entitled to recover the difference in its costs resulting from this change in depreciation value, which amounts to the sum of $141,876.-13. The claim was presented to the contracting officer and later to the ASBCA on appeal and it was denied in both instances.

The Board based its decision on an interpretation of paragraph 7 of the novation agreement quoted above. While the Board had authority to make such an interpretation since the problem arose under the contract and was covered by the disputes clause, we are not bound to accept it as final because the interpretation of a contract is a question of law to be determined by the court. E.g., Perini Corp. v. United States, Ct.Cl., 381 F.2d 403, p. 409, decided July 20, 1967.

The plaintiff contended before the Board and now contends here that paragraph 7 of the novation agreement should be interpreted so as to apply the prohibition to total costs only, as distinguished from any item of increased costs, and to the actual costs of making the transfer, such as attorney fees and possible "premiums" or "bonuses" paid for the contracts over and above their true value. It says that the restriction does not apply to costs incurred in the performance of the contract, because such a construction would require it to have the same costs as AMF had before the transfer, such as those pertaining to overhead, labor, and general and administrative expenses. Plaintiff says this is impossible, as it would require plaintiff to agree not to make claim for any increase in cost of performance, which would, in turn, require it to know what AMF's costs would have been had the transfer not been made. It urges that this is contrary to the spirit and purpose of a CPFF contract, which is used only where the cost of performance cannot be estimated accurately enough to allow a fixed-price type of contract.[6]

The Board interpreted the meaning of paragraph 7 as follows:

> We think that the total cost theory does not avail. Under paragraph 7, supra, appellant has agreed not to claim " * * * *any costs* * * * arising out of or attributable to (i) said assignment, conveyance and transfer, or (ii) this Agreement * * * " (underscoring supplied) except such costs as were reimbursable under the contracts prior to the novation agreement. The words "any costs" are broad. They restrain the reimbursement of particular costs on a selective

---

6. Plaintiff cites ASPR 3-405-1(b) (1963 ed.). This same provision is in 32 C.F.R. (1967 ed.).

basis, where it appears that the cost increase arose out of the transfer. Moreover, it can hardly be doubted that the so-called "excess" depreciation and amortization arose out of the transfer of ownership of the Turbo Division.

■ We think the decision of the Board is correct. Paragraph 7 of the novation agreement clearly prohibits and is restricted to those costs *arising out of or attributable* to the transfer or agreement except those costs for which defendant was liable under the contracts before the transfer was made. The increase in depreciation value of the assets of AMF is clearly within this prohibition because it arose out of and was attributable to the conveyance.

We do not agree with plaintiff's argument that the prohibition should be limited to the actual costs of the transfer, such as attorney fees and premiums or bonuses paid for the property over and above its value. Certainly, these items are included in the restriction and defendant would not be liable for them because they arose out of or were attributable to the assignment, but the prohibition cannot be said to be limited to them alone. It is our view that claims of the plaintiff for normal increases in the cost of labor, material, and even overhead, occurring after the transfer in the ordinary course of business, would not be prohibited by the novation agreement, because they would not have arisen out of the transfer nor have been attributable to it. Such increases in costs would have occurred without the assignment and defendant would have been liable for them.

It is obvious that not all increases in costs are prohibited, but only those which are attributable to or arise out of the transfer. The plaintiff argues that no two companies are exactly alike as to bookkeeping systems, accounting procedures, overhead and indirect costs. Because of these factors, it says that the general and accounting expenses of each company are different to those of any other company. It reasons that because

of this situation, if the G&A costs of a transferee should be more than those of a transferor in a transaction such as exists in the instant case, the transferee could not collect all of its G&A costs because of the prohibition in the novation agreement. This situation is not before us and we are not called upon to decide it. If such facts exist in the instant case, they have not been brought to our attention, and defendant has not refused the payment of any of plaintiff's increased G&A expenses for this reason. Plaintiff, consequently, has no cause for complaint on this score.

We think the Board reached the correct result. We, therefore, hold that the increased depreciation costs of the assets in question were within the prohibition of the novation agreement and plaintiff is not entitled to recover. Claim 1 is accordingly denied.

### Claims 2 and 4

The issues in Claims 2 and 4 are practically the same and for that reason will be considered together. Both relate to building No. 10. This building was constructed by AMF in 1956, who sold it to the Aetna Life Insurance Company and then leased it back for a period of ten years at an annual rental of $62,183. The performance of the two contracts was begun by AMF in this building, and it was used for the same purpose to some extent by AMF and the plaintiff, respectively, until the contracts were terminated. As stated above, defendant terminated both contracts on February 10, 1959. The plaintiff continued to occupy the building until August 1, 1960, when it was vacated. The building remained vacant until June 1, 1962, when it was subleased by plaintiff to Lockheed Aircraft Corporation for approximately the same rental that plaintiff had been paying for it. The plaintiff contends that defendants should be required to pay rental costs on the building while it remained vacant (August 1, 1960, to June 1, 1962) as termination costs incurred beyond December 31, 1959, the date to which defendant paid termination

costs.[7] The amount of this claim is $151,725 and is being asserted by plaintiff as Claim 2.[8]

Claim 4 is similar to Claim 2 and also involves building No. 10. It is based on the following facts. After the contracts were terminated, plaintiff continued to occupy building 10 until August 1, 1960, but did not use all of it in carrying on the work of terminating the performance of the contracts. It contends that a large portion of it represented "idle space" that was not used for anything between the date of termination on February 10, 1959, until all of the building was vacated by plaintiff on August 1, 1960. Defendant allowed plaintiff's claim for idle space to the extent of 37 percent of the total facilities costs up to December 31, 1959, but no further. Plaintiff had contended that there was more than 37 percent of idle space in the building after termination, but agreed to accept this percentage in settlement. However, as stated above, plaintiff was only paid for such idle space from the date of termination on February 10, 1959, to December 31, 1959. Plaintiff says that it should be paid for idle space in the building from December 31, 1959, up to the date it vacated the building entirely on August 1, 1960, in the sum of $100,841. This is plaintiff's Claim 4 (Claim 5 before the ASBCA).

The plaintiff presented Claims 2 and 4 to the contracting officer, who denied them. The contracting officer decided that under the contracts, defendant was only required to pay plaintiff its fees and costs up to the date of termination and for a reasonable time thereafter, but in no event beyond December 31, 1959, the date he contended was the completion date of the contracts even if they had not been terminated before that time. The plaintiff did not agree that the comple-

tion date of the contracts was December 31, 1959, but contended they would not have been completed by that date, but extended much beyond 1959, and, in the alternative, that it could not be determined definitely when they would be completed, but in any event, the completion date would be later than December 31, 1959.

The plaintiff appealed the decision of the contracting officer to the Armed Services Board of Contract Appeals (ASBCA). The Board sustained the decision of the contracting officer and denied both claims. The decision of the Board is now before us for review.

■ The Board decided that the completion date of the contracts was December 31, 1959. The plaintiff disputed this and said there were various amendments to the original contracts which extended them beyond that date. The Board recognized only one amendment made the day before termination which called for a maintenance study by plaintiff on the APS unit through June of 1960, but held that this was terminated the next day and it did not have the effect of extending the completion date of the main contracts. Plaintiff admitted in its complaint before the Board that "the expiration date of the contracts was December 31, 1959" and stated further that December 31, 1959, was "the date on which the contracts were scheduled to have been completed." We think that the completion date of the contracts was a question of law for determination by the court, but that the Board has correctly decided the question and we will not disturb it. See Copco Steel & Engineering Co. v. United States, 341 F.2d 590, 169 Ct.Cl. 601 (1965).

We are aware, however, that although the ultimate question is one of law, subsidiary findings of fact were essential

---

7. Although defendant terminated the contracts on February 10, 1959, it paid plaintiff termination costs up to December 31, 1959, which was 11 months after termination.

8. The period of this claim is 22 months which at the annual rental rate of $62,-

183 would not amount to the $151,725 being asserted in this claim. We have not been shown why the amount claimed is more than the rate of annual rental for the 22 months (August 1, 1960, to June 1, 1962) involved.

to its solution. These included a recital by the Board that the only evidence adduced concerning future missile programs was a witness whose testimony concerned a five-year budget study to be prepared by the plaintiff. Responding to questions from the Board, the witness stated that this document had been sent to the plaintiff directly from the Ballistic Missile Center with instructions to fill out its cost estimates based upon the program in the document. This was stated to have been an annual requirement. The Board also found that when AMF constructed building 10 in support of its corporate purposes, the defendant neither then nor later by the instant contracts undertook to underwrite, in any sense, the total financing of this capital asset. The Board continued:

> * * * This was not a special purpose building, peculiar to the instant contracts, and of no value otherwise. The only contract right AM&F acquired was that to be reimbursed for the cost of ownership and use insofar as the use of the building was allocable to the contracts. Nor was any greater right acquired by the sale and leaseback. The Government recognized the rental therein stipulated as reasonable, and has reimbursed this item of cost during performance and for nearly eleven months beyond termination.

As can be seen, the Board found no reason in fact to extend the completion dates of the contracts or otherwise extend the period for which compensation should be paid to the plaintiff.

■ The plaintiff's attack on these findings is limited to general conclusions that the Board is wrong and under such circumstances the Board's findings on these facts are entitled to finality under Wunderlich Act standards. See Claims 3 and 5, infra.

■ The most difficult question the Board had to decide was the determination of the termination costs that defendant was required to pay plaintiff when it terminated the contracts. It properly looked to the provisions of the contracts for guidance on this problem.

The contracts contained the following provisions with respect to termination costs:

> 10.e.(1) (i) There shall be included therein all costs and expenses *reimbursable in accordance with this contract,* not previously paid to the contractor for the performance of this contract *prior* to the effective date of the Notice of Termination, and such of *these costs* as may continue for a reasonable time thereafter with the approval of or as directed by the Contracting Officer * * *. (Italics supplied.)

The Board also considered Armed Services Procurement Regulations 15, Part 2, Cost Principles, which were referred to in the contract and also the sections of ASPR 8 pertaining to CPFF terminations and held that they were controlling. The plaintiff claimed before the Board, and now contends here, that ASPR Section 8–402 (1955 ed., as amended) should control, but the Board held, and we agree, that this section applies to fixed-price contracts. The plaintiff admits this is true, but says it should also apply to CPFF contracts. The argument of plaintiff would be more persuasive if the contract did not have provisions governing termination costs and if it did not refer to the sections of ASPR mentioned above. We think the contract shows the intent of the parties and must control.

It may be seen from the above-quoted provision of the contract that upon termination of the contracts, all cost and expenses reimbursable under the contract not previously paid to the contractor prior to termination, and "such of these costs as may continue for a reasonable time thereafter" were the termination costs required to be paid to the plaintiff in this case. All costs and expenses were paid to plaintiff by defendant up to the date of termination. The question before the Board was whether there were any of such costs which continued for a reasonable time after termination, and, if so, how long was a reasonable time. The Board held that all costs and expenses of plaintiff in performing the

contracts did extend beyond the termination date of February 10, 1959, and up to December 31, 1959, which was eleven months after the termination date. We think the Board found, at least impliedly, that this eleven-month period was a "reasonable time" after termination of the contracts during which such costs and expenses were required to be paid. It matters not that the end of this eleven-month period coincided with the completion date of the contracts, namely, December 31, 1959. The Board cited and quoted the "reasonable time" provision of the contract with approval, and we must assume that in fixing the eleven-month period as the time during which the costs and expenses had to be paid, it considered this to be the reasonable time required by the contract. However, we would like to point out that it would have been better for all concerned if the Board had stated plainly and with clarity that it found that the eleven-month period ending December 31, 1959, was a reasonable time during which plaintiff's costs and expenses were required to be paid. This is what the contract provided and this is what the Board decided, but it did not say so in so many words.

█ The determination of what is a reasonable time is a question of fact. National Movers Co., Inc. v. United States, Ct.Cl., 386 F.2d 999, decided November 9, 1967. It was within the jurisdiction of the Board to decide this question. The plaintiff has not specifically attacked the decision of the Board on the ground that eleven months was not a reasonable time after termination of the contracts for the payment of the costs and expenses of plaintiff as required by the contracts, nor has it proved that any other time would have been a reasonable time. We think there is substantial evidence to support the finding of the Board in this regard.

█ We do not agree with the statement of the Board that according to the termination provisions of the contract and ASPR 15, Part 2, "the maximum reimbursement thereunder is the total *that could have become payable* to the com-

pletion date of the contract." (Emphasis supplied.) We think this involved an interpretation of the contract and of the applicable regulations, which is a question of law, and the Board's decision in this regard is erroneous as a matter of law. There could be, in a proper case, costs and expenses incurred in the performance of the contract that continue for a reasonable time after the completion date for which the defendant would be liable. We do not think the completion date is an absolute bar in every case to the collection by a contractor of legitimate costs incurred in the performance of a CPFF contract which continue or extend for a reasonable time beyond such completion date. This depends on the facts and circumstances of each case and especially on whether the costs are reimbursable under the contract and whether they accrued within a reasonable time after the completion date. These principles are in accord with the nature and spirit of CPFF contracts, and afford a standard of conduct that is fair and equitable to the contractor and the government alike. However, they must be tested by the facts and circumstances in each individual case.

The plaintiff contends that ASPR Section 8–402(b) (28) (1955 ed., as amended), governing *fixed-price* contracts, should control Claims 2 and 4. This regulation provides in effect that rent on an unexpired lease may be collected by the contractor "for the *period of the contract* and such further period as may be reasonable * * *." (Emphasis supplied.) Plaintiff also points out that this same provision was included in the 1960 revision of the regulations (ASPR 15) for guidance both as to termination of CPFF contracts as well as fixed-price contracts. It is the position of the plaintiff that this is evidence of the regulatory intent which existed at the time the instant contracts were entered into and, accordingly, recovery of costs beyond the completion date of the contracts is not barred by such completion date. While we agree with plaintiff that the com-

pletion date in a CPFF contract may not bar costs that accrue thereafter in every case whether by reason of principles of justice and fair dealing between the parties, or because the regulations cited by plaintiff so provide, this does not help the plaintiff in the instant case. Here, the question is whether the eleven-month period beyond the termination date was a reasonable time for the payment of costs. The Board found in effect that it was, and plaintiff did not prove otherwise. On the record before us, we think the finding of the Board was correct.

The defendant paid the plaintiff all costs and expenses due it in performing the contracts, including rent on building No. 10, up to the date of termination of the contracts on February 10, 1959, and for a reasonable time thereafter, namely, up to December 31, 1959. Plaintiff's Claims 2 and 4 accrued after the latter date and defendant has no liability with reference to them. Consequently, we hold that plaintiff is not entitled to recover on Claims 2 and 4.

### Claim 3

As stated earlier, this claim is for true depreciation costs for building No. 20, and also for building No. 3A under a Necessity Certificate for the remainder of the five-year true depreciation period continuing after December 31, 1959.

With the hope that we are not being repetitive, the facts and circumstances of this claim will be exhaustively related for a clearer understanding of the rights and liabilities of the parties thereunder.

The defendant provided industrial facilities to the plaintiff under a separate contract which was terminated for convenience shortly after the termination of the contracts involved in the instant litigation. Building No. 20, which is the larger of the two buildings involved in Claim 3, was not provided under that facilities contract. It appears, however, that in April 1957, AMF had requested that the government provide a building with 30,000 square feet of floor space under this same facilities contract. The defendant declined this request and under date of May 24, 1957, replied:

\* \* \* \* \* \*

2. \* \* \* As stated in the 9 May 1957 meeting cited in referenced letter, the Air Force will not provide the 30,000 square foot building requested by AMF/TD. According to data submitted in the facilities application, more than 90% of the floor space now being used by AMF to support its ballistic missile work has been obtained by lease. Since lease costs are borne by the supply contract, it is evidence that AMF's contribution of plant space has been negligible to date. If AMF cannot provide the additional space needed to perform program commitments, but is relying on the Air Force to provide brick and mortar as well as the severable facilities heretofore provided and currently requested, it is urged that MCPTB be notified as soon as possible. In this connection, it must be pointed out that a contractor's ability and willingness to provide required facilities, particularly brick and mortar, are prime factors for consideration in placing follow-on as well as initial supply contracts.

\* \* \* \* \* \*

It was with this background that the plaintiff, less than one year later, asked a private architectural and engineering firm to study the task involved in expanding its operational facilities. The findings and recommendations of that firm, conveyed in a report to the plaintiff on July 14, 1958, disclosed that the proposed testing program could not be handled at the facility then in existence. Further, it was stated that the present site could not be economically improved to meet projected research and development requirements. Finally, development of a new testing facility "is a practical solution and is the recommendation of this report."

That this report was th direct inspiration for the construction of building No. 20 is amply demonstrated by the fact that it was rendered just one month prior to its construction. It is also of key importance that the defendant reimbursed the plaintiff for the cost of

the engineering studies leading to the construction of building No. 20.

On August 14, 1958, at the beginning of construction of building No. 20, the plaintiff applied to the Office of Defense Mobilization for a "Necessity Certificate" pursuant to the provisions of Section 124A (Amortization deduction) of the Internal Revenue Code of 1939. The plaintiff related the facilities to the defense effort by the following recitals. The facilities were needed because of the expansion of defense activities in missiles, rockets, and other other space applications, in which expansion the plaintiff's assigned part had increased very substantially in five years. The plaintiff anticipated expansion of activities in the immediate future with the output of such facilities being 100 percent for defense purposes. The facility in the forseeable future of five years would not lend itself to commercial application and unless defense requirements continued there would be no obvious use for these facilities.

On the basis of the plaintiff's application, the Office of Defense Mobilization on February 12, 1959, two days subsequent to the termination here involved, issued Necessity Certificate No. TA–NC–32876, addressed to the Commissioner of Internal Revenue finding that 60 percent of the cost of construction of the described facilities (Building Nos. 20 and 3A) was attributable to the national defense program. By grant of such Necessity Certificate, the plaintiff was entitled to charge, as a cost of doing business for Federal income tax purposes, 60 percent of the cost of construction over a five-year period, in lieu of the substantially longer period over which buildings of this kind are normally depreciated.

On April 28, 1959, two and one-half months after termination of the prime contracts, the plaintiff addressed an application for the determination of true depreciation to the Air Force Emergency Facilities Depreciation Board. This request showed on its face that the Air Force prime contracts in support of the missile program had been terminated in February 1959. It also showed that the date of completion of the facilities covered by the Necessity Certificate, above-described, occurred on December 1, 1958.

The Emergency Facilities Depreciation Board determined on September 17, 1959, seven months after the termination, that true depreciation allowable as an element of cost in negotiated contract prices would be 55 percent of the actual cost, at the rate of 11 percent per year over the five-year emergency period beginning with the date of completion of all certified assets included in the Necessity Certificate. Neither the parties nor the Board has explained the reason for, or the effect of, the true depreciation determination made seven months after termination.

In presenting its claims resulting from the termination of the subject contracts, the plaintiff included an amount representing the determined true depreciation of building Nos. 20 and 3A. The defendant, however, allowed reimbursement only for the period ending on December 31, 1959. This allowance, as with Claims 2 and 4 previously discussed, was at least impliedly based on the contract completion date of December 31, 1959, as being a reasonable time after termination. The Board in passing on the remainder of the claim totaling $50,434.94, which amount was not in dispute in the event plaintiff prevailed, held in effect, that the plaintiff was not entitled to the full true depreciation but was limited to the period encompassed by the completion dates of the contracts. The Board's decision also rested upon the finding that the facility was not special purpose and that it was constructed as a normal corporate venture by the plaintiff.

 The sole question then for resolution under this claim is whether the plaintiff is entitled to reimbursement for its true depreciation costs continuing after December 31, 1959, the date on which the contracts were to be completed, and for the remainder of the

five-year true depreciation period. We hold for the reasons set forth below that it is so entitled.

In rejecting the plaintiff's claim, the Board stated in summary fashion, that the building in question was not a special purpose building capable only of use in the instant program. This conclusion the Board supported by merely setting out the fact that building No. 20 was subsequently leased. The Board then concluded:

> The decision to build was the normal corporate decision, and assumption of risk attendant thereto, facing any contractor desiring to place itself in a position to compete for business.

Unlike the assertions made by the plaintiff with respect to building No. 10, its challenge to the Board's finding that building No. 20 was not a special purpose building is accompanied by facts not considered by the Board in its opinion, and citations to the administrative record. These include references to the circumstances we have already mentioned which confirm the fact that pressure was obviously exerted upon the plaintiff to expand its facilities for performance under the instant contracts. The defendant also admitted in its answer, that it financed the cost relating to the study of these future facilities needs.

Further, the Air Force Emergency Facilities Depreciation Board which allowed 55 percent of the actual cost of construction at the rate of 11 percent per year as an item of cost in negotiated contract pricing, only did so after a full consideration of the contractor's application and all evidence submitted in support thereof. Once again, this allowance postdated the termination of the prime contracts by seven months. On the basis of these facts we do not accept the conclusions of the Board that building No. 20 was not a special purpose building and the product of a normal corporate decision.

■ The Board's recitation of its reasoning is so summary and inadequate that we cannot really tell whether its decision is a true finding of fact under the proper standard, a conclusion of law, or a factual determination under an improper standard. In these circumstances, we cannot give as much deference to the Board's decision as if it had detailed its findings to support the conclusions referred to above. We are compelled to look to the Board's record without much assistance from the Board's opinion, and, therefore, without the need to accord its determination as much weight as we otherwise would. In scanning the record, we are satisfied that, if the correct legal standard is applied, there is no substantial evidence to sustain the Board's decision in this respect. See Loral Electronics Corp. v. United States, Ct.Cl., 387 F.2d 975, pp. 980–981, decided December 15, 1967.

■ The Board did not identify the criteria which would permit adhesion of the label "special purpose" to a given building or other facility. It did, however, state: "The building in question was not a special purpose building * * as is amply shown by its subsequent leasing." We are not in agreement as a legal proposition with the Board's determination that a subsequent leasing of the facility propels it out of, or prohibits it from being in the category of "special purpose." We are in accord with the plaintiff that one would understand from such a conclusion that the building would have to be wholly unusable by any one other than the plaintiff and and susceptible only to conversion for scrap. No such requirement existed for either the determination of true depreciation or for the obtaining of a Necessity Certificate. The undisputed facts reveal that at the time of termination, the two contracts encompassed over 95 percent of the Turbo Division business. Building 20 was completed just two months prior to termination and it seems a fair inference from the facts already related that the decision to construct was not an everyday corporate decision, but rather was one dictated by the specific needs of the two subject contracts.

We feel that costs are allocable to a contract if the contractor reasonably believes that they are necessary for contract performance and are not prohibited by the contract or by applicable regulations. This does not mean, however, that the contractor's subjective intent binds the government. To be allocable as a direct charge, the actions of a contractor must be in furtherance of a requirement of the contract. For instance, in DeLong v. United States, 175 F.Supp. 169, 146 Ct.Cl. 289 (1959), even though a shipyard rented by the contractor for performance of the contract actually turned out to be unnecessary for contract performance, the contractor was held entitled to the rental as a reimbursable cost where it was found to be a cost incurred incident to contract performance. See Lockheed Aircraft Corp. v. United States, 375 F.2d 786, 794–796, 179 Ct.Cl. 545, 559–560 (1967).

We determine that the facts exposed by the record compel the conclusion that building No. 20 was a special purpose building constructed reasonably and primarily for and incident to the performance of the contracts in dispute here.

We now turn to the applicable regulations and contract provisions to determine if this claim is independently barred by them.

The standard termination article has been set forth supra. As will be recalled, it calls for reimbursement of costs as may continue for a reasonable time after termination. Both terminated contracts provide that allowable cost will be determined in accordance with Part 2 of Section XV of the Armed Services Procurement Regulations *in effect on the date of the contract and the schedule*. The significant ASPR provision in effect is set forth in ASPR 15–602.2 (Revised May 18, 1955).

\* \* \* \* \*

15–602.2 Allowances for Depreciation. Allowances for depreciation (other than "true depreciation") as provided in Section 167 of the Internal Revenue Code of 1954, subject to the limitations set forth in paragraph 15–602.3, shall be acceptable for contract costing purposes. Allowances for "true depreciation," as that term is defined in DOD Instruction 4105.34 of 1 July 1954, shall be in accordance with said Instruction, and shall be exclusive of other methods of depreciation with respect to the assets involved in the determination of "true depreciation."

In this connection, DOD Instruction 4105.34, July 1, 1954, paragraph "H", reads as follows:

\* \* \* \* \* \*

H. Contractors may use normal depreciation without requesting a determination of true depreciation, or may elect to use normal depreciation even though a determination of true depreciation has been made. In either such case, contract pricing for both the emergency period and the post-emergency period (i. e., throughout the entire life of the emergency facility) will be based upon normal depreciation; and in such cases ASPR 15–205 (b) (ii) is not intended to apply to assets fully amortized on the contractor's books of account under certificates of necessity. In all other cases, contract pricing for the post-emergency period will be based on depreciation computed by allocating the undepreciated cost of the emergency facilities at the end of the emergency period (cost less true depreciation for that period) over the estimated remaining life of the facilities, provided the remaining undepreciated portion of such cost shall not include any amount of unrecovered true depreciation.

\* \* \* \* \*

Paragraph "H" in DOD 4105.34, as revised under date of September 29, 1959, and relied upon by the Board, reads as follows:

\* \* \* \* \*

H. Contractors may use normal depreciation without requesting a determination of true depreciation, or may elect to use either normal or true depreciation after a determination of

true depreciation has been made. Once either method is elected, it must be followed consistently through the life of the emergency facility. Where an election is made to use normal depreciation, ASPR 15–205(b) (ii) is not intended to apply to assets fully amortized on the contractor's books of account under Certificates of Necessity. *Where an election is made to use true depreciation, it shall be prorated over the full five year emergency period, and proportionate amounts shall be allocated to contracts only for those fiscal periods during which the contracts are performed during the five year period.* Care must be exercised to assure that no other allowance is made under the contract which would duplicate the factors, such as extraordinary obsolescence, considered in the determination of true depreciation. In addition, where an election is made to use true depreciation, contract pricing for the post-emergency period will be based on depreciation computed by allocating the undepreciated cost of the emergency facility at the end of the emergency period (cost less true depreciation for that period) over the estimated remaining life of the facility, provided the remaining undepreciated portion of such cost shall not include any amount of unrecovered true depreciation. (Underscoring supplied.) [Italicizing indicates language emphasized by the Board.]

The Board, after stating that allowable cost is to be determined by regulations in effect on the date of the contract, proceeds to deny the plaintiff's claim on the basis of DOD Instruction 4105.34, supra, as revised September 29, 1959, months after performance ceased under the two contracts in issue. The Board found that the regulation allowed a contractor to claim true depreciation only for the period during which the contracts were actually being performed and not for the full five-year period. The Board stated that the revision of the regulation was after the determina-

tion of true depreciation dated September 17, 1959, but before the determination was transmitted to the plaintiff on October 23, 1959. This timing the Board concluded was evidence of an intent on the part of the Air Force to be bound by the determination of true depreciation, only under the conditions expressed in revised paragraph H, supra.

■ In the first place, the cost principles in effect on the date of the contract usually determine cost allowability questions. See Cibinic, Cost Determination 15 (Gov't Con.Mon. No. 8, Geo. Wash.U.1964). In addition, if any speculation should be indulged in concerning the timing of the revision of the regulation, it would be, at the very least, that the regulation in effect on the date of the execution of the contracts did not preclude the plaintiff's claim for true depreciation. This is so because the Depreciation Board made its determination that 55 percent of the actual cost of construction was allowable as an element of cost for the five-year emergency period prior to the revision previously mentioned. The Depreciation Board mentioned that the plaintiff filed its application for true depreciation pursuant to DOD Instruction 4105.34, dated July 1, 1954, and then made the requested determination. We do not believe that the Depreciation Board thought it was acting contrary to the regulation and could not grant the determination sought. The fact that it did so seven months subsequent to contract termination supports the decision that building No. 20 was a special purpose building and that the effective regulation permitted the relief plaintiff now seeks.

■ In any event, as we pointed out in Moran Bros., Inc. v. United States, 346 F.2d 590, 593, 171 Ct.Cl. 245, 250 (1965), *any ambiguity that might arise* between the contract provisions and the applicable regulations would be resolved against the drawer of the instrument, the defendant. The completion date as fixed by the Board is not, per se, a bar to the recovery of the amount under dispute in Claim 3. With respect to this

claim, the completion date of December 31, 1959, does not coincide with the outside limit of the period of reasonableness as was the case concerning Claims 2 and 4. As a matter of law, we hold that "such of these costs as may continue for a reasonable time thereafter" includes true depreciation for the remainder of the five-year emergency period within the meaning of the Termination Article. On this claim the plaintiff is entitled to recover $50,439.94.

### Claim 5

Plaintiff's fifth claim represents general and administrative (G&A) costs relating to subcontract administration and termination. The amount of this claim is $108,101.44. The plaintiff's claim for an additional allowance for G&A expenses is based on the theory that it is entitled to receive its full experienced G&A rate instead of the 5 percent allowed by the contracting officer and by the Board as a home office corporate expense. Due to the complexity of this claim and its disposition by the court, a summarization of the facts as found by the Board follows.

The plaintiff's Turbo Division has a pool of general and administrative expense which it allocates to jobs and contracts on what it terms a "cost of sales" basis. Although the defendant contended that the allocation was on a total manufacturing costs incurred basis, the Board determined that there was no real difference between the two as applied to the facts of this case. Each year up to the time the two contracts were terminated, the plaintiff was allowed for cost reimbursement purposes a G&A rate based on the ratio of its pool of G&A expense to its total input costs (costs of manufacturing) for such year.

The dispute between the parties concerns the applicable G&A rate after the date of termination. The plaintiff claimed a G&A rate of 7.05 percent based on a G&A pool of $186,551 and manufacturing costs of $2,645,674. The government auditor made various adjustments and computed a G&A rate for the period to December 31, 1959, of 11.5 percent,

which was substantially higher than the rate submitted by the plaintiff. The government auditor's rate, however, was based on the exclusion of $451,089 of "settlements with subcontractors" and $920,411 of "termination expenses." The exclusion of these two items from the rate base had the effect of increasing the G&A rate approximately four percentage points, but the net effect was to reduce greatly the amount of G&A expense allowable, as the auditor recommended that no G&A expense be allowed on subcontract settlements or termination expenses, the explanation being:

> * * * Costs applicable to the terminated contracts are excluded from the base for allocation of these expenses because items similar in nature have been charged directly to the terminated contracts. * * *

The net effect of the auditor's recommendation would have been to increase the amount of G&A expense reimbursable under continued contracts, but to more than offset this increase by allocating no G&A expense to the terminated contracts, the justification for no G&A allocation on terminated contracts being that costs of a G&A nature had already been allowed as direct costs of termination settlements.

After the government auditor's recommendation, there were conferences between the parties at which it was mutually agreed that the direct allowances for settlement expense did not cover "corporate expense," that is, G&A costs incurred by the plaintiff's home office. The parties agreed upon a "corporate cost" allowance of 5 percent to apply to the two terminated contracts from and after the date of termination. This payment by the defendant was without prejudice to the plaintiff's right to make claim for allocation of additional G&A expense to the terminated contracts. The Board was of the opinion that the record established that the claimed additional G&A allowance was requested on all cost billings to which the 5 percent corporate expense rate had been applied, which cost billings included not only payments made

in settlement of terminated subcontracts, but also such termination settlement expense of a G&A nature as legal and accounting expenses incurred in connection with the terminations.

The plaintiff's argument in support of this claim, both here and before the Board, relates mostly to subcontract settlements. It says that the subcontracts, totaling about one million, were fixed price subcontracts that were about 90 percent complete when they were terminated; that had they been CPFF subcontracts it could have billed and been reimbursed for most of the subcontract costs before the prime contracts were terminated, in which event it would have received a full G&A rate allowance on the subcontract costs. It argues that it is inequitable for it to receive a smaller G&A allowance than it would have received had the prime contracts not been terminated, particularly when most of the subcontract performance was prior to termination of the prime contracts.

The Board noted that while the plaintiff claimed entitlement "to its full general and administrative expense rate on subcontract settlements" it did not justify by the presentation of its evidence at the hearing, any additional G&A allowance on the costs for which it was reimbursed as direct costs of termination settlements.

The Board denied the plaintiff's claim with the following language:

\* \* \* \* \*

The basic reason why Claim 6 must be denied is that appellant is not entitled to recover its general and administrative expenses two ways, first as direct termination settlement expense and again by an allocation of indirect costs of the same type. There is no evidence that appellant failed to recover all the pre-termination G&A expense it incurred, and there is no evidence that the amounts allowed for termination settlement expense plus the 5% allowance for corporate cost are less than the full amount of post-termination general and administrative expense actually incurred by appellant

and properly allocable to the terminated contracts.

The question as framed by the plaintiff for resolution on review by this court is whether under the facts and circumstances here, it is entitled to reimbursement of its G&A costs for settlements with subcontractors and for its subcontract termination expenses at its then prevailing G&A rates.

■ We have the same trouble as that experienced by the Board, namely, dissecting the plaintiff's bona fide factual assertions from a mere recitation of the derogatory language contained in the so-called Wunderlich Act, supra. The plaintiff's brief is replete with declarations that both the contracting officer and the Board were wholly arbitrary and capricious in their determinations denying the plaintiff's claim. However, plaintiff's brief with respect to this claim "is a general declamation of protest, not a specification of errors of the Board in its findings of fact." Jefferson Constr. Co. v. United States, 368 F. 2d 247, 252, 177 Ct.Cl. 581, 589 (1966) Its references to the record are insubstantial and cannot form the predicate for overturning the Board's finding that the plaintiff has already been compensated for the sum claimed. The plaintiff, however, seeks to cast the responsibility on the defendant's shoulder for factually supporting the Board's decision. It asserts that the record before the Board contains absolutely no evidence that the G&A costs were either billed as direct costs or were reimbursed as direct costs. Further, the plaintiff asserts that the action by the defendant is contrary to generally accepted accounting practices and to the plaintiff's application of such practices in its own bookkeeping. It is true that neither of the parties has pointed out the precise mechanics of the mathematical computations involved so that it may be determined whether the disputed finding was supported by substantial evidence. The entire administrative record is before us, however, and the plaintiff has the burden of establishing the fact that the record does not

support the Board's finding. This it has failed to do. It is not the court's function to supply this deficiency by an independent excursion along the administrative trail. See Jefferson Constr. Co. v. United States, supra, at 589, 368 F.2d 247; Jefferson Constr. Co. of Florida v. United States, 364 F.2d 420, 424, 176 Ct. Cl. 1363, 1369 (1966), cert. denied, 386 U.S. 914, 87 S.Ct. 865, 17 L.Ed.2d 786 (1967); Midwest Spray & Coating Co. v. United States, 176 Ct.Cl. 1331, 1338 (1966).

 That the determination of this claim should not be disturbed is reinforced by the contract provisions themselves.

10. TERMINATION

\* \* \* \* \* \*

(b) After receipt of a Notice of Termination and except as otherwise directed by the Contracting Officer, the Contractor shall \* \* \* (5) with the approval or ratification of the Contracting Officer, to the extent he may require, which approval or ratification shall be final and conclusive for all purposes of this clause, settle all outstanding liabilities and all claims arising out of such termination of orders and subcontracts, the cost of which would be reimbursable, in whole or in part, in accordance with the provisions of this contract; \* \* \*

\* \* \* \* \*

(1) If the settlement includes cost and fixed fee—

\* \* \* \* \*

(ii) There shall be included therein so far as not included under (i) above, the cost of settling and paying claims arising out of the termination of work under subcontracts or orders, as provided in paragraph (b) (5) above, which are properly chargeable to the terminated portion of the contract.

(iii) There shall be included therein the reasonable costs of settlement, including accounting, legal, clerical, and other expenses reasonably necessary for the preparation of settlement claims and supporting data with respect to the terminated portion of the contract and for the termination and settlement of subcontracts thereunder, together with reasonable storage, transportation, and other costs incurred in connection with the protection or disposition of termination inventory; \* \* \*.

The plaintiff, other than the general statement previously mentioned, has never asserted that the contractual provisions set forth above were not complied with. In fact, they seem to embrace the exact costs contained in Claim 5. Without more, we are inclined to presume that these provisions have been obeyed. For this additional reason, Claim 5 is denied.

## COUNT II

 Plaintiff also brings this action for breach of contract implied in fact in the amount of $310,266.38, under which it alleges it acquired the facilities to perform the work for the defendant already discussed. It further alleges that it was the intention of both parties at all times that the defendant would reimburse the plaintiff for costs resulting from the long-term leases and facility construction extending beyond the performance periods for the research and development contracts. While such intentions and agreements were not reduced to writing and not formalized in a single contract, the plaintiff insists that there existed a contract implied in fact binding on both parties. This alternative claim for damages is without merit. It has not been questioned but that the Board had jurisdiction to render complete relief under the "Disputes" clause of the contracts. In such an instance, as here, where the plaintiff relies on the same facts and theories in its claim for breach of contract, which it relied on in its claims before the Board, the Board's findings of fact are insulated against judicial correction unless the specified defects mentioned in the first section of the Wunderlich Act, supra, are present. United States v. Utah Constr. & Mining Co., 384 U.S. 394, 86 S.Ct. 1545, 16

L.Ed.2d 642 (1966); Turnbull Inc. v. United States, Ct.Cl., 389 F.2d 1007, decided July 20, 1967. The Board determined, and we have accepted the finding that the only evidence concerning future programs was a single document—an annual budget study. This falls far short of supporting the position of the plaintiff that it was "advised, directed, and induced" by the defendant to enter into long-term leases for buildings and construct facilities "upon the representations that the supply contracts or continuing manufacture requirements under the two contracts would be forthcoming." Accordingly, Count II is denied.

We hold, therefore, that plaintiff is entitled to recover on Claim 3 in the amount of $50,439.94 and to that extent judgment is entered for plaintiff, its motion for summary judgment is granted, and the defendant's motion is denied. With respect to the remainder of the claims, the plaintiff's motion is denied, the defendant's motion is granted, and the petition is dismissed.

COLLINS, J., took no part in the decision of this case.