The ROFLAN COMPANY, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 609–81C.

United States Claims Court.

Jan. 11, 1985.

Martin W. Cohen, Boston, Mass., for plaintiff.

Lorraine B. Halloway, Washington, D.C., with whom was Asst. Atty. Gen., J. Paul McGrath, Washington, D.C., for defendant.

## OPINION ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

REGINALD W. GIBSON, Judge:

In this contract action, before the court on the parties' cross-motions for summary judgment, plaintiff, The Roflan Company (Roflan), seeks review under the standards of the Wunderlich Act, 41 U.S.C. §§ 321–

322,[1] of two adverse decisions of the Armed Services Board of Contract Appeals (ASBCA), Nos. 23141 and 23636, which were jointly tried on July 17, 1979. Through its appeal docketed as No. 23141, plaintiff sought to reverse the contracting officer's final decision of June 27, 1978, terminating for default (pursuant to the standard Default clause) plaintiff's contract, to supply 40-watt light fixtures to the Defense General Supply Center (DGSC), because plaintiff failed to meet the requirements of the revised delivery schedule. Additionally, through its appeal docketed as No. 23636, plaintiff concomitantly sought to reverse the contracting officer's final decision of January 23, 1979, assessing $21,160.05 against the plaintiff for excess reprocurement costs incurred by the defendant.

On March 7, 1980 (certified on March 14, 1980), the ASBCA denied both appeals, concluding that termination for default was proper and that The Roflan Company was liable to the government for the excess cost of the reprocurement for the undelivered light fixtures. However, pursuant to a stipulation entered into by the parties, the quantification of such excess costs, but not the method of calculation, was deferred until such time as the government presented evidence to the plaintiff in proof of the actual excess costs incurred. Thereafter, on September 29, 1980, plaintiff filed with the ASBCA a Motion For Further Hearings regarding ASBCA appeals Nos. 23141 and 23636, averring that it would be discriminatory and inequitable to impose the assessed damages because such an imposition in similar circumstances had been consistently and widely waived and ignored by the government. Notwithstanding said contention, on October 23, 1980 the Board refused to rule on the merits of said motion inasmuch as it was not timely filed within the permissible time frame prescribed, pursuant to the ASBCA's rules.[2]

Following the foregoing adverse rulings, in its petition to this court for a Wunderlich Act review, plaintiff avers that said decisions of the ASBCA are not entitled to finality in that they "are arbitrary, capricious and grossly erroneous and are not supported by substantial evidence, and contain errors of law." Plaintiff further avers that the errors made by the Board in its decision of March 14, 1980, include:

"A. The finding by the [B]oard that reliance by the [g]overnment on an erroneous report concerning the condition of the mold to justify a termination of the contract is irrelevant.

B. The finding by the [B]oard that plaintiff failed to sustain the burden of showing that the failure to deliver was caused by factors beyond the control of, and without the fault or negligence of the plaintiff and its subcontractor.

---

**1.** "§ 321. Limitation on pleading contract-provisions relating to finality; standards of review

No provision of any contract entered into by the United States, relating to the finality or conclusiveness of any decision of the head of any department or agency or his duly authorized representative or board in a dispute involving a question arising under such contract, shall be pleaded in any suit now filed or to be filed as limiting judicial review of any such decision to cases where fraud by such official or his said representative or board is alleged: *Provided, however,* That *any such decision shall be final and conclusive unless the same is fra[u]dulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence."* (Emphasis added.)

"§ 322. Contract-provisions making decisions final on questions of law

No Government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board."

**2.** Specifically, the ASBCA held in its October 23, 1980 decision that "[t]o the extent that appellant's motion is a request for reconsideration of the Board's decision, it is untimely and denied. Moreover, appellant has neither demonstrated that the Board's decision was in error or that good cause exists for reopening the hearing. ... If appellant's cause of complaint relates to the procurement policy of the Government as opposed to the quantification of the reprocurement costs, this Board does not have jurisdiction to direct the procurement agency in the exercise of its discretionary functions."

C. The finding by the [B]oard that there was no excusable reason for the plaintiff's failure to deliver."

With regard to the ASBCA decision of October 23, 1980, asserting, *inter alia,* a lack of jurisdiction, plaintiff alleges that it was erroneous as a matter of law.

Against the foregoing background, plaintiff has moved for summary judgment overruling the decisions of the ASBCA in that said decisions are not supported by substantial evidence and therefore are not entitled to finality. Defendant cross-motions for summary judgment and contends that the ASBCA's decisions should be given finality, as contemplated by the standards of the Wunderlich Act because they are supported by substantial evidence, are neither arbitrary nor capricious and are correct as a matter of law.

Premised on a thorough review of the pleadings of the parties, including the cross-motions for summary judgment and the administrative file, the court concludes that the ASBCA's decision upholding the contracting officer's decision to terminate for default the contract with plaintiff and to hold it liable for excess reprocurement costs is supported by substantial evidence and is correct as a matter of law. Additionally, the court finds that the ASBCA decision, denying plaintiff's Motion For Further Hearings because the motion was untimely filed, is likewise correct as a matter of law. Jurisdiction in this action is based on 28 U.S.C. § 1491 and 41 U.S.C. §§ 321–322.

## FACTS

*ASBCA Appeal No. 23141*

The facts hereinafter stated were found by the ASBCA, are supported by substantial evidence, and are properly derived from the administrative record. *Ordnance Research, Inc. v. United States,* 221 Ct.Cl. 641, 645–47, 609 F.2d 462, 465–66 (1979).

On March 24, 1977, the government, through the Defense General Supply Center, issued IFB DSA–400–77–B–1841, requesting bids to supply 3,300 40-watt light fixtures, NSN 6210–00–215–6355. Through a TWX on May 12, 1977, plaintiff's bid was accepted and thereafter on May 19, 1977, it was formally awarded contract No. DSA–400–77–C–2239 (2239) as the lowest of the three responsive bidders. Subject contract was a firm fixed-price supply contract that required Roflan to deliver, on or before December 23, 1977, 3,300 light fixtures, at a unit price of $20.50 for a total contract price of $67,650. In Finding No. 5, the ASBCA found that "appellant had previously subcontracted the molding of the castings, which were needed for the manufacture of the light fixtures, to Kiesel Manufacturing of Batavia, New York (Kiesel)." While the administrative record is void of any definitive documents establishing said fact, the testimony of Thomas Roche, president of Roflan, was that the requirements of contract No. 2239 were placed with Kiesel through an increase in the quantity of a pre-existing purchase order. Given the foregoing supplementary finding, which is undisputed, we conclude that the substance of Finding No. 5 is supported by substantial evidence. *Ordnance Research, Inc. v. United States,* 221 Ct.Cl. at 646, 609 F.2d at 465. Included in the contract was the standard Default clause which was incorporated therein by reference, 32 C.F.R. 7–103.11 (Aug. 1969), and a J2 option clause that gave the government the right to increase the stipulated quantity under the contract by 100 percent.

Exercising this increased quantity option, the government issued, on May 26, 1977, Modification P00001 which required an additional 3,300 units to be delivered on or before January 23, 1978, and also increased the total contract price by $65,650 to $135,300. Thereafter, in June 1977, The Roflan Company was notified by its subcontractor, Kiesel, that the mold Roflan had previously supplied it to manufacture the 40-watt light fixtures had a crack. Kiesel was authorized to repair the mold and Roflan in turn paid Kiesel $500 for the repair on November 10, 1977. (Tr. 25.) Additionally, on

November 5, 1977, there was an electrical fire in Kiesel's plant.

Thereafter, on December 14, 1977, the government became cognizant that plaintiff would be unable to meet the agreed delivery schedule. As a consequence, the Administrative Contracting Officer (ACO) noted, in a production progress report, that there were delays in receiving castings from vendors and that there were in-house production overloads at Roflan's plant. Such circumstances induced the ACO to recommend to the Procuring Contracting Officer (PCO) that the delivery schedule be revised. In conformity therewith, on January 24, 1978, the PCO authorized the ACO to negotiate a revised delivery schedule for consideration.

Roflan's sales manager, on February 2, 1978, signed the revised delivery schedule, for the undelivered balance of 5,123 units, which became effective on March 3, 1978, through Modification A00001. The revised schedule, as represented in the government's production capability letter dated February 15, 1978, called for the monthly delivery of 1,000 units each, on or before March 31, 1978, April 28, 1978, May 31, 1978, June 30, 1978, July 31, 1978, respectively, with the remaining 123 units to be delivered on or before August 31, 1978. It was noted in Modification A00001 that the basis of this change was neither supported by consideration to the government or because of an excusable delay on the part of the contractor. On the same date as this modification, March 3, 1978, the plaintiff managed to ship 400 units to the defendant which turned out to be plaintiff's last shipment under the subject contract. Moreover, plaintiff failed to deliver the full 1,000 units due on March 31, 1978, as required by the revised delivery schedule of March 3, 1978.

In that connection, the plaintiff conceded, throughout its appeals, that it failed to meet the March 31, 1978 revised delivery date, as well as those on April 28, 1978 and May 31, 1978. In view of the initial failure, *supra,* the ACO issued a show cause/cure letter to Roflan on April 11, 1978.

Through this requirement to show cause, Roflan was afforded an opportunity to present, in writing, any facts that bore on the question of whether its failure to deliver, as required by the revised delivery schedule of March 3, 1978, arose from causes beyond its control and without its fault or negligence. A written response, dated April 21, 1978, and signed by Roflan's sales manager, D.F. Keohane, advised that the subcontractor, Kiesel, without Roflan's authorization, used too small a press in molding the castings for the 60-watt fixtures it was manufacturing under a different contract (No. 5646)—but simultaneously with contract No. 2239—causing an electrical fire on November 5, 1977, and cracking Roflan's mold used in manufacturing 40-watt fixtures. The letter further stated that Roflan was advised that the mold for contract No. 2239 was "badly damaged as well." Since then, the letter further explained, the quality of the No. 2239 units manufactured by Kiesel had been inferior, precluding Roflan from delivering the fixtures timely. The letter went on to say that major expenditures would have to be incurred to bring the equipment back to functioning ability and that plaintiff understood units were available from other sources at a unit price less than that of the subject contract. In conclusion, Roflan stated that it would not be adverse to cancellation of the contract at no cost to it or the United States because the noted fire was not within their control but rather within the scope of an act of God.

Contrary to the April 21, 1978 letter, *supra,* the president of Roflan, Thomas Roche, who had been Roflan's vice-president and general manager during the life of the subject contract, testified before the Board that the electrical fire was not relevant as to how the 40-watt mold was cracked. But, he also testified that he did not know how the mold became broken. In fact, no evidence was introduced that shed any light on the question of exactly how the 40-watt mold cracked.

Given the foregoing showing by plaintiff, *supra,* on May 8, 1978, the ACO forwarded

a copy of a DCASMA Buffalo report of May 2, 1978, concerning the electrical fire at Kiesel, to the Directorate of Procurement and Production at the Defense General Supply Center. The report, which was the subject of prime contract DSA400–76C–5646, found that the November 5, 1977 fire was limited and confined to certain wiring within the electrical conduit. It further added that although the mold in question (re contract No. 5646) had a pre-existing crack, it was not damaged by the fire, and that a smaller identical mold used in production, presumably the 40-watt mold, had a similar crack. However, during the hearing before the Board, testimony was adduced from Mr. Roche that there were several errors in this report and that the report was not referring to the mold used in the subject contract (No. 2239). The ACO, in her letter to the Directorate of Procurement and Production, to which the Buffalo report was enclosed, made reference to Roflan's April 21, 1978 response to the government's show cause letter and the enclosure of the Buffalo report. She recommended that inasmuch as it appeared that the delay was inexcusable, premised in part on the May 2, 1978 report which related to contract No. 5646, this contract (*i.e.*, No. 2239) should be terminated for default.

In view of the ACO's recommendation to terminate contract No. 2239, apparently premised, at least, in part on the May 2, 1978 Buffalo report relating to another contract (No. 5646), the Directorate of Procurement and Production sent Mr. Keohane, Roflan's sales manager, a letter on May 10, 1978, stating that his April 21, 1978 letter, in response to its demand to show cause, contained insufficient information (regarding delays in making the deliveries as scheduled) to make a decision. He then explained in detail the requisite circumstances that are necessary to excuse Roflan from default under the Default clause and requested Roflan to submit additional evidence to show that its failure to perform was excusable and to advise when it intended to complete the contract. The Roflan Company responded by a letter on May 19, 1978, signed by T.F. Roche (the then vice-president and general manager), stating that it was indisputable that the mold was cracked and not capable of producing items of acceptable quality. Mr. Roche further stated that if the government was questioning the credibility of Kiesel's explanation regarding the cause of the problem, the government had at its disposal the resources to discover any evidence of fault or negligence in the actions of Kiesel and that Roflan would take all appropriate legal action to recover the damages it suffered. Also, Mr. Roche revealed that it was impossible, at this time, to make an estimate as to when the mold would be repaired or, if necessary, replaced. He again expressed the position that Roflan would not object to a cancellation of the contract for convenience of the government.

Early in June of 1978, The Roflan Company got the mold back from Kiesel and realized that it was irreparably damaged. At that time, 4,723 units remained to be delivered under the subject contract. Thereafter, on June 27, 1978, the government terminated the undelivered portion of the contract for default by issuing Modification P00002 on said date. Pursuant to the Default clause, the termination was based on Roflan's failure to deliver the supplies in accordance with the established revised delivery schedule or present evidence establishing an excusable cause for the non-delivery. Plaintiff filed its appeal to the ASBCA, contesting the contracting officer's decision to terminate the contract for default, on or about August 14, 1978. Contrary to Mr. Roche's subsequent testimony at the hearing, as mentioned *supra*, The Roflan Company alleged in its complaint to the Board that as a result of an electrical fire at the subcontractor's place of business, its mold was damaged, resulting in a failure to complete delivery.

*ASBCA No. 23636*

Two months before the default termination of Roflan's contract, the government issued, on April 28, 1978, IFB DLA 400–78–B–2112, calling for the delivery of 5,106 40-watt light fixtures, NSN–6210–00–215–

6355. At least three bidders were expected to respond. On May 23, 1978, the L.C. Doane Company (Doane) submitted its bid, offering 2,414 units at $24.57 each, 2,574 units at $25.06 each, and 118 units at $25.51 each.

On July 10, 1978, the government determined that Doane was the only responsive bidder. Roflan, which had been expected to bid thereon, submitted a "no bid at this time" offer of $36.00 per unit, which included $10.00 for tooling needed to repair certain damage caused by fire. The other anticipated bidder, Pauluhn Electric Mfg. Co., also submitted a "no bid" because it was encountering difficulty in the manufacture of a similar item. Based on a comparison with prior prices paid for the same item as well as Roflan's bid (estimated by the government for the sake of comparison to be a $36.00 bid less $10.00 for tooling, or $26.00), the government determined that Doane's bid was both fair and reasonable.

Thereafter, on September 15, 1978, the government accepted Doane's bid and awarded it contract No. DLA 400–78–C–3170 (3170). As in the terminated Roflan contract, contract No. 3170 contained a 100 percent quantity option clause. Because Doane turned out to be the sole responsive bidder for this (No. 3170) contract, the government decided that future procurements, for these particular light fixtures, would be by negotiation until Roflan obtained new molds and was able to perform, and Pauluhn Electric Mfg. Co. solved its problems.

In accordance with the government's decision to procure the light fixtures through negotiation, the defendant issued, on July 6, 1978, DLA 400–78–R–2958 (2958) to 12 firms, calling for proposals to supply 7,237 light fixtures, NSN–6210–00–215–6355. Because of the termination for default on the Roflan contract, the government, in July of 1978, through Amendment 0001 increased the number of units to be delivered under DLA(2958) from 7,237 to 12,000 units. On December 28, 1978, Doane, being the sole responsible bidder under DLA(2958), was awarded contract DLA–

400–79–C–0798 (0798) to supply 5,570 units at $25.96 each, 6,262 units at $25.06 each and 168 units at $26.41 each.

Rather than reprocure the 4,723 units that Roflan failed to deliver under the subject contract by using the contract (0798) that the defendant had with Doane, the government determined that it would be cheaper to exercise an option clause that it had under its (3170) contract awarded on September 15, 1978 (supra). On December 28, 1978, the government issued Modification P00003, increasing the quantity of units to be delivered under contract (3170) by 5,106 units. Roflan was subsequently notified, by the contracting officer's final reprocurement decision in a letter dated January 23, 1979, that the 4,723 units that it failed to deliver under its terminated contract were repurchased through the option clause in contract No. 3170, and, as a result, $21,160.05 in excess reprocurement costs were due and owing to the government in accordance with the Default clause of the contract. On February 2, 1979, Roflan gave formal notice to the contracting officer of its appeal of his January 23, 1979 final decision.

## DISCUSSION

In reviewing decisions of the ASBCA pursuant to the Wunderlich Act, this court must accept the Board's findings of fact unless it finds them to be arbitrary, capricious, fraudulent, so grossly erroneous as to show bad faith, or unsupported by substantial evidence. *Kaminer Construction Corporation v. United States*, 203 Ct.Cl. 182, 191, 488 F.2d 980, 984 (1973); *BCM Corporation v. United States*, 2 Cl.Ct. 602, 605 (1983). Thus, the scope of this court's review in a Wunderlich Act case is narrow and limited. It is limited generally to determining whether there is substantial evidence, that is, such evidence as might convince a reasonable person to support the conclusion reached by the Board. *Koppers Co., Inc. v. United States*, 186 Ct.Cl. 142, 148, 405 F.2d 554, 557 (1968).

Plaintiff, in pursuit of a Wunderlich Act review, "has the burden to specify the facts and circumstances contained in the Board's record, which make the Board's decision lacking in substantial evidence." *Jefferson Construction Company v. United States,* 177 Ct.Cl. 581, 589, 368 F.2d 247, 252 (1966); *Sundstrand Turbo v. United States,* 182 Ct.Cl. 31, 60, 389 F.2d 406, 422–23 (1968). Protests equating to no more than declarations of bland generalities concerning a Board's decision do not give rise to the focused specificity of Board error required for this court to overturn a Board decision. *Jet Construction Company, Inc. v. United States,* 209 Ct.Cl. 200, 203–04, 531 F.2d 538, 540 (1976). When the plaintiff fails to meet its burden, "[i]t is not the court's function to supply this deficiency by an independent excursion along the administrative trail." *Sundstrand Turbo v. United States,* 182 Ct.Cl. at 60, 389 F.2d at 423, citing to *Jefferson Construction Co. of Florida v. United States,* 176 Ct.Cl. 1363, 1369, 364 F.2d 420, 424, *cert. denied,* 386 U.S. 914, 87 S.Ct. 865, 17 L.Ed.2d 786 (1967). Additionally, as envisioned by 41 U.S.C. § 322, conclusions of law made by the ASBCA are not accorded the finality given to facts. Thus, as to the applicable law, this court is free to make its independent conclusions.

In light of the foregoing delineated standard of review and the specific allegations raised in plaintiff's petition, four issues are presented:

Whether the Board erred in finding:

1) that it was irrelevant whether or not the government considered an erroneous report concerning the condition of the mold when it decided to terminate the Roflan contract for default;

2) that plaintiff failed to sustain its burden of proof to show that the failure to deliver was caused by factors beyond the control of and without the fault or negligence of the plaintiff and its subcontractor;

3) that there was no excusable reason for the plaintiff's failure to deliver; and

4) that it did not have jurisdiction, as a matter of law, to consider Roflan's Motion For Further Hearings.

Stated another way, said issues are whether substantial evidence exists to support the foregoing four findings of the Board.

*Irrelevancy of the Buffalo Report on the Right to Terminate for Default*

Under the Default clause[3] of the contract the defendant "may ... terminate the whole ... contract" if the contractor fails to make delivery of the supplies "within the time specified ... or any extension thereof." In its Finding No. 9, the Board found that "[i]t is undisputed that Roflan failed to deliver the full 1000 units due on March 31, 1978 as required by the revised schedule."

Plaintiff, on no less than two occasions (in its brief in support of its motion for summary judgment, and in its reply to defendant's opposition) conceded that "defendant had a right to terminate the contract." Nevertheless, it contends in its

---

**3.** The Default clause provides, in pertinent part, as follows:

"(a) *The Government may,* subject to the provisions of paragraph (c) below, by written notice of default to the Contractor, *terminate the whole or any part of this contract ...*
(i) *if the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof ...*
(b) In the event that the Government terminates this contract in whole or in part as provided in paragraph (a) of this clause, the Government may procure, upon such terms and in such manner as the Contracting Officer may deem appropriate, supplies or services similar to those so terminated, and the Contractor shall be liable to the Government for any excess costs for such similar supplies or services ...
(c) ... *If the failure to perform is caused by the default of a subcontractor, and if such default arises out of causes beyond the control of both the Contractor and the subcontractor, and without the fault or negligence of either of them, the Contractor shall not be liable for any excess costs for failure to perform, unless the supplies or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit the Contractor to meet the required delivery schedule."* (Emphasis added.)

brief that "[t]hat, however, is not the issue." The question is, argues the plaintiff, whether the defendant and thus the Board could properly hold it liable for an assessment of damages (excess reprocurement costs) where the determination of fault on the part of plaintiff is founded on an incorrect premise, *i.e.*, the Buffalo report describing the mold as undamaged. The plaintiff contends that the report describing the mold as undamaged by the November 5, 1977 fire did not relate to the mold in question (used to manufacture 40-watt fixtures) but rather referred to a mold used to manufacture a 60-watt fixture under a different contract. Thus, it is the plaintiff's contention that the contracting officer's finding that there was no excuse for a delay was based on a report relating to an entirely different contract.

The defendant counters, with the argument that there is no evidence that the decision to terminate the contract for default was based on the Buffalo report. Moreover, defendant contends, even absent consideration of said report, there was sufficient substantial evidence to support a termination for default because, as the Board found, the plaintiff failed to meet the revised delivery schedules. This is clearly corroborated by the concessions, *supra*, of plaintiff's counsel.

In disposing of the issue regarding the right of the defendant to terminate the contract for default solely for the failure to meet the revised delivery schedule, the Board stated:

> The crux of the matter is that the required deliveries were *not* made. The Default clause gives the [g]overnment the immediate right to terminate. Therefore, the relevancy or irrelevancy of the DCASMA report is a moot question since *the simple failure to deliver is the only justification the TCO actually needed in order to terminate the contract for default.* Roflan's burden was to show, by a preponderance of the evidence, that the failure to deliver was caused by factors beyond the control of, and without the fault or negligence of, both itself and

Kiesel. This the appellant has clearly not done. (Emphasis added.)

The court agrees with the Board's determination that the relevancy of the DCAS-MA Buffalo report was insignificant on the issue of the right to terminate for default. As the Board pointed out, the plaintiff failed to meet the revised delivery schedules. That failure, even if plaintiff had not conceded that termination was legally proper, was, *ipso facto*, sufficient to terminate the contract. *See also Churchill Chemical Corp. v. United States*, 221 Ct.Cl. 284, 290, 602 F.2d 358, 362 (1979). The plaintiff's argument that it should not have been defaulted in the first instance because the Buffalo report was erroneous totally misses the point. The terminating contracting officer (TCO) stated in the June 27, 1978 termination notice that the termination was based on Roflan's failure to deliver the supplies in accordance with the established delivery schedule or present evidence of an excusable cause for the non-delivery. We find, therefore, that substantial evidence exists in the administrative record to support the Board's finding that delivery was not made as required by the revised contract, that it is neither arbitrary nor capricious, and further that the Board's legal conclusion (*i.e.*, "the simple failure to deliver is the only justification ... needed ... to terminate the contract for default") is correct as a matter of law.

*Burden of Proof*

■ In addition to its entitlement to terminate the contract because of plaintiff's failure to make delivery within the time specified in the contract, the Default clause also permits the government to reprocure the undelivered items and hold the contractor "liable ... for any excess costs for such similar supplies." On the other hand, the defaulting contractor may be exempted from the imposition of excess reprocurement costs if it proves by a preponderance of the evidence that the reasons for the failure(s) were beyond the control and without the fault or negligence of either the contractor or its subcontractor. *See Franklin E. Penny Co. v. United States*,

207 Ct.Cl. 842, 856, 524 F.2d 668, 676 (1975); *Mil-Craft Manufacturing, Inc.,* ASBCA No. 19305, 74–2 BCA ¶ 10,840.

■ Plaintiff aggrieves that the contracting officer's finding, that there was no valid excuse for the failure to make timely deliveries, was "based on a report relating to an entirely unrelated situation." (See Pltf's Brief, p. 5.) The court notes that plaintiff's contention is not totally accurate. It was the ACO who recommended, based on the Buffalo report, that the contract be terminated for default. This recommendation was made to the Directorate of Procurement and Production who by letter dated May 10, 1978, requested "the contractor submit evidence to show that its failure to perform is excusable and advise when it intends to complete the contract." Said letter also advised plaintiff of the elements required to be established under the Default clause which would legally excuse it from the assessment of excess reprocurement costs. Rather than submit probative evidence that the default arose out of causes beyond its control, and thus was without its fault or negligence, plaintiff's response (May 19, 1978) to the May 10, 1978 inquiry simply made the conclusory hospitable assertion that it is "without fault or negligence" and, concomitantly, suggested that the government undertake an investigation of Kiesel, its subcontractor, in search of fixing fault or negligence for such failure. Following the foregoing, on June 27, 1978, it was the TCO (and not the ACO) who in fact terminated subject contract premised on the supplementary inquiry and plaintiff's non-probative response, *supra*. In the TCO's termination notice, it was stated (and the Board found in substance in Finding No. 16) that:

... no excusable cause *has been presented* for failure to deliver this quantity. This termination is based on your failure to perform in accordance with the terms and conditions of the contract, specifically your failure to deliver the supplies in accordance with the established delivery schedule.... [S]aid default is without excusable cause.... (Emphasis added.)

In connection with the foregoing, defendant simply avers that plaintiff did not meet its burden of establishing that it should be excused from the excess reprocurement costs. Defendant therefore argues that the Board's decision should be affirmed because it is supported by substantial evidence.

Regarding the plaintiff's burden of proof to excuse itself from liability, the Board stated:

In attempting to exculpate itself from liability, the contractor has put forward a varied assortment of claims and assertions, including blaming Kiesel for starting the fire which damaged the mold by using too small a press in the performance of some of its other operations ..., claiming that the mold was cracked by some unknown means prior to the Kiesel fire ... and asserting that it was innocent but suggesting a [g]overnment investigation of Kiesel to find fault or negligence on its part.... Unfortunately, for the appellant, none of these assertions support its claims at all because they do nothing to carry forward its burden of proof.

As to this issue, the court also agrees with the Board that plaintiff has not sustained its burden of proof. *See Franklin Penny Co. v. United States,* 207 Ct.Cl. 842, 856, 524 F.2d 668, 676 (1975). It is not enough to just argue, as the plaintiff does here in its summary judgment motion, that "[it] and Kiesel made every effort to produce and deliver the items, but it was impossible to deliver items of acceptable quality without fabricating a new mold." As the defendant has pointed out, the plaintiff has shown no evidence as to what in fact was the cause of the mold failure. Further, the plaintiff's inconsistent position (through the April 21, 1978 letter of its sales manager and the testimony of its president (Tr. 29–30)), as to whether the electrical fire was to blame, only underscores the fact that it does not know the cause of the mold failure and thus cannot prove that the delay was not beyond the control or without the fault or negligence

of Roflan and Kiesel. In Finding No. 12, the Board specifically found that "[n]o evidence was introduced ... that would shed any light on the question of exactly how the mold did, in fact, become cracked." Failing to prove how the mold became cracked, which result precluded plaintiff from making timely deliveries, also precluded plaintiff from establishing that such default arose from causes beyond its (and Kiesel's) control and without the fault or negligence of either. Proof of such ultimate facts was an imperative to exculpating plaintiff from the excess reprocurement costs, as to which the Board held that plaintiff "has clearly not done." Thus, we find that the Board's conclusion that plaintiff failed to meet its burden of proof as a predicate to an exemption from the assessment of excess reprocurement costs is supported by substantial evidence, is neither arbitrary nor capricious, and is correct as a matter of law.

*No Excusable Reason For Failure To Deliver*

▇ Plaintiff alleges that the Board's finding that there was no excusable reason for the plaintiff's failure to deliver was in error. Because that contention is essentially tantamount to its allegation that the Board erred in finding that plaintiff did not meet its burden of proof, it is unnecessary to belabor this point. The record is crystal clear that plaintiff did not provide any excuse that would relieve it from liability under the Default clause. Plaintiff's reliance on *Livingston v. United States*, 101 Ct.Cl. 625 (1944), is misplaced. *Livingston* addresses a delay caused by a strike and is inapposite to the facts here.

The court also concurs with the Board's conclusion that:

In light of the lack of any excusable reason for Roflan's failure to deliver, it is not necessary to decide the second tier of the Default clause test for the avoidance of liability, *i.e.*, whether the necessary mold could have been acquired from another source in time to permit Roflan to meet the contractual delivery requirements.

To avoid liability under the Default clause, plaintiff was compelled to prove that its failure to deliver timely was neither within the control of or the fault or negligence of itself or its subcontractor and that it could not acquire the units from another source in time to satisfy the revised delivery schedule. Plaintiff had the burden to prove *all* of these elements. Since the operative language is stated in the conjunctive, once plaintiff failed to prove the initial elements (*i.e.*, the absence of control, fault, negligence), it was unnecessary to decide whether the plaintiff had proved that such items could not be timely obtained from another source.

*Assessment of Excess Reprocurement Costs*

▇ In its appeal complaint of March 28, 1979, to the ASBCA of the final decision of the contracting officer assessing plaintiff $21,160.05 as excess reprocurement costs for the repurchase of the 4,723 undelivered (*i.e.*, similar) units from L.C. Doane Co., on December 28, 1978, plaintiff averred that said decision was in error because said items could have been repurchased by the government without any additional cost had the contracting officer acted expeditiously at the time of termination (June 27, 1978). Thus, plaintiff contended that such costs should not be assessed. Defendant responded by stating that the 4,723 repurchased units were identical to the terminated units under contract No. 2239; that the defendant acquired same through the exercise of an option clause in contract No. 3170 pursuant to Doane's option price on May 30, 1978, which was approximately 30 days prior to the June 27, 1978 termination date of contract No. 2239; and that that price was lower than Doane's price under RFP No. 2958 which included the terminated quantity therein.

With respect to this issue, the Board cited to *Environmental Tectronics Corp.*, ASBCA No. 21204, 78–1 BCA ¶ 12,986, at 63,308, which provides that excess reprocurement costs are assessable upon the establishment of three essential elements—

(i) the repurchased supplies must be similar to those terminated; (ii) the government must have acted reasonably and mitigated excess costs; and (iii) the cost must have in fact been incurred and so shown by *prima facie* evidence. Since both the reprocurement and the terminated contract called for 40-watt light fixtures, NSN6210–00–215–6355, the Board found the first element—similarity—to have been duly satisfied. With respect to the second element, the Board deemed that to have been met inasmuch as defendant determined excess costs under the option clause price of contract No. 3170 rather than contract No. 0798 (under which the reprocurement was originally planned) which was the then lowest price available. As to the final issue—incurrence—the plaintiff argued before the Board, and defendant agreed, that the determination of the amount of the excess reprocurement cost assessments should be postponed until defendant produced documentary evidence of the actual price paid for the reprocured units.

The Board found that a reprocurement contract had been "reasonably entered into" and that plaintiff is liable for such excess costs which shall be calculated by the difference between the original contract price (No. 2239) and the actual reprocurement cost under contract No. 3170. It then remanded to the parties, pursuant to their stipulation, the calculation of said amount of excess costs upon the submission of *prima facie* evidence by defendant of "actual excess costs incurred."

The plaintiff has failed to raise any specific objections to the Board's decision regarding its factual findings and legal conclusions regarding the propriety of defendant assessing excess reprocurement costs. It does not contend that the reprocured items were not similar, nor does it argue here that defendant did not act reasonably in mitigation of such excess costs.

It is well settled that the plaintiff has the burden of establishing which of the Board's findings the record does not support. This it has failed to do. Thus, it is not incumbent upon the court to "supply this defi-

ciency by an independent excursion [through the administrative record]." *Sundstrand Turbo v. United States,* 182 Ct.Cl. 31, 60, 389 F.2d 406, 423 (1968). It is sufficient to say that the court finds that the Board's decision is supported by substantial evidence, is neither arbitrary nor capricious, and is correct as a matter of law. *See Astro-Space Laboratories, Inc. v. United States,* 200 Ct.Cl. 282, 308, 470 F.2d 1003, 1018 (1972); *United States v. Russell Electric Co.,* 250 F.Supp. 2, 24 (S.D.N.Y.1965).

*Jurisdiction—Re Plaintiff's Motion for Further Hearings*

■ Following the Board's decision on March 7, 1980, the defendant, pursuant to the parties' stipulation, submitted to plaintiff on or about May 13, 1980, *prima facie* documentary evidence of the incurrence of the excess reprocurement costs for its concurrence. Instead of responding pointedly thereto and challenging the sufficiency of the *prima facie* evidence establishing excess reprocurement costs, plaintiff, on September 29, 1980, filed its "Motion For Further Hearings" with the ASBCA "with respect to the issue of enforceability of the contract clause dealing with termination for cause and damages." Plaintiff premised its grounds for such motion on the alleged fact that termination and the imposition of damages had been consistently and widely waived and ignored by the government, to the extent that to enforce such against it would be "inequitable and discriminatory." Legal error is strenuously asserted by plaintiff because the Board in failing to rule favorably on the Motion For Further Hearings stated as one of its reasons that "[i]f appellant's cause of complaint relates to the procurement policy of the [g]overnment ... this Board does not have jurisdiction to direct the procurement agency in the exercise of its discretionary functions."

Our threshold observation regarding the efficacy of plaintiff's position is that the court finds that plaintiff has selectively ignored the thrust of the Board's dispositive decision on said motion. First, the

court notes that in response to plaintiff's September 29, 1980 request for further hearings (wherein plaintiff alleged that it would be "inequitable and discriminatory" to impose damages that are consistently waived by the government), the Board held that under Rule 29 [4] of the ASBCA Rules, plaintiff's motion, to the extent it is a request for reconsideration of the March 7, 1980 Board decision, is untimely and denied.

Rule 29, entitled Motions For Reconsideration, provides that:

A motion for reconsideration, if filed by either party, *shall* set forth specifically the ground or grounds relied upon to sustain the motion, and *shall* be filed within 30 days from the date of the receipt of a copy of the decision of the Board by the party filing the motion. (Emphasis added.)

The record facts disclose that the Board's dispositive decision regarding plaintiff's appeals Nos. 23141 and 23636 was dated March 7, 1980, and received by plaintiff on or about March 17, 1980. Thereafter, plaintiff filed its Motion For Further Hearings on September 29, 1980. Clearly then, plaintiff's motion was filed with the ASBCA *more than* 30 days after it had received a copy of the Board's March 7, 1980 decision.

Without more, the use of the word "shall" preceding the phrase "be filed within 30 days" leads inescapably to the conclusion that this requirement is obligatory (*i.e.*, in effect jurisdictional) in which case the Board is without discretionary power where the filing is outside of said time period. However, we note that the pream-ble to the ASBCA's rules provides that such time limitations are eligible for extension in appropriate circumstances, *i.e.*, on "good cause shown." [5] In denying the motion as untimely, the Board specifically found that "appellant has neither demonstrated that the Board's decision was in error or that good cause exists for reopening the hearing." Given said deficiency, even assuming arguendo that the Board possessed discretion to grant such relief where sought outside of the "30 days," it is clear that plaintiff's motion was properly denied for failure to make the required "good cause" showing. Further, upon examination of all of the ASBCA rules, there is no other motion, as a matter of law, that plaintiff's motion could be brought under and characterized as, other than a Rule 29 motion for reconsideration. Thus, this court is constrained to agree with the Board that, as a matter of law, under Rule 29, plaintiff's Motion For Further Hearings was untimely. Because the failure to comply with Rule 29 completely disposes of plaintiff's Motion For Further Hearings, it is unnecessary to determine whether the Board erred, by its gratuitous statement that, if appellant's cause of complaint relates to the procurement policy of the government as opposed to the quantification of the procurement costs, this Board does not have jurisdiction to direct the procurement agency in the exercise of its discretionary function.

We conclude, therefore, that substantial evidence exists to support the Board's factual finding(s); that the Board was correct [6] in characterizing said motion as a

---

4. In said motion, plaintiff failed to cite by number to any specific rule of the Board which would entitle it to the relief sought. Given such omission, the Board, *sua sponte*, determined that Rule 29 (ASBCA) was the only rule of the Board which most nearly provides the relief sought by plaintiff's motion.

5. Under the ASBCA rules, all time limitations specified for various procedural actions are computed as maximums, and are not to be fully exhausted if the action described can be accomplished in a lesser period. These time limita-tions are similarly eligible for extension in appropriate circumstances on good cause shown.

6. The Board further stated that if the parties were unable to negotiate the amount of the reprocurement costs as directed in ASBCA No. 23636, "appellant may request a contracting officer's decision and file a new appeal." By letter dated February 24, 1981, to the contracting officer, plaintiff requested a "determination of damages to form the basis of an appeal." Thereafter, by notice dated March 16, 1981, the contracting officer issued a final decision that the withholding of the $21,160.05 as excess pro-

Rule 29 motion; and that its interpretation thereof was reasonable and proper as a matter of law, particularly whereas here plaintiff made no showing of entitlement whatsoever.

## CONCLUSION

The court finds that the decisions of the Board on March 7, 1980 and October 23, 1980 regarding plaintiff's appeals Nos. 23141 and 23636 are—supported by substantial evidence, not arbitrary and capricious, and are correct as a matter of law. The plaintiff's motion for summary judgment, therefore, is denied and the defendant's motion for summary judgment is granted. The plaintiff's petition, therefore, shall be dismissed.

IT IS SO ORDERED.

---

curement costs was a proper exercise of the government's right of set-off. To date, said final

decision of the contracting officer has not been appealed to the ASBCA nor to this court.